HENRIETTA MEYER, Respondent, *v.* THE SUPREME LODGE, KNIGHTS OF PYTHIAS, Appellant.

1. CONTRACT — WHEN CONSUMMATED IN THE STATE OF NEW YORK AND ENFORCEABLE ACCORDING TO ITS LAWS. A certificate of membership issued by a fraternal mutual benefit corporation organized under Federal statutes, through its officers at Chicago, in the state of Illinois, to a resident of the state of New York, upon which was printed, "I hereby accept this certificate of membership subject to all the conditions therein contained," signed by the applicant and dated at New York, one of which conditions was that it was first to take effect as a binding obligation when the acceptance was executed by him, is a contract consummated in the state of New York and is to be enforced according to the laws of that state. The provisions of sections 834 and 836 of the Code of Civil Procedure, therefore, prohibiting the disclosure by a physician of professional information, unless they have been expressly waived upon the trial by the personal representatives of the deceased, apply to such a contract although it contained a waiver of them by the applicant; and the prohibition of the Federal Constitution against legislation in impairment of contracts has no application.

2. EVIDENCE — WHEN PROFESSIONAL TREATMENT BY PHYSICIAN AGAINST PROTEST OF PATIENT ESTABLISHES PROFESSIONAL RELATIONS BETWEEN THEM — INFORMATION ACQUIRED BY SUCH PHYSICIAN PROTECTED FROM DISCLOSURE UNDER CODE CIV. PRO. § 834. When one who is sick unto death is in fact treated by a physician as a patient, even against his will, he becomes the patient of that physician by operation of law; the same is true of one who is unconscious and unable to speak for himself. Any information, which is necessary to enable such physician to act. as such, is acquired "in attending a patient in a professional capacity" within the meaning of section 834 of the Code of Civil Procedure and is protected from disclosure.

*Meyer* v. *Knights of Pythias*, 82 App. Div. 359, affirmed.

(Argued February 26, 1904; decided March 15, 1904.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered April 30, 1903, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the dissenting opinion.

*Laurence G. Goodhart* and *Carlos H. Hardy* for appellant. The terms of the benefit certificate issued by the defendant to Emanuel Meyer, the laws and rules of the defendant, together with the application for membership by Emanuel Meyer, constitute the contract which existed between the member and the society, which instruments construed together measure the rights of the litigants, and are binding in all respects upon the plaintiff. (*Sabin* v. *Phinney*, 134 N. Y. 143; *Hellenberg* v. *District No. 1*, 94 N. Y. 580; *Sanger* v. *Rothschild*, 123 N. Y. 577; *Grossman* v. *Supreme Lodge*, 13 N. Y. S. R. 592; *Fullenwider* v. *Royal League*, 180 Ill. 625.) The contract in suit is within the protection of the non-impairment clause of the Federal Constitution. (U. S. Const. art. 1, § 9; *Bascom* v. *Zediker*, 48 Neb. 380; *Waldron* v. *Ritchings*, 9 Abb. Pr. [N. S.] 359; *Armstrong* v. *Best*, 112 N. C. 59; *E. L. Society* v. *Clements*, 140 U. S. 226; *Carrollton* v. *A. C. Co.*, 124 Fed. Rep. 25; *Shelton* v. *Haxtun*, 91 N. Y. 124;

*McIntyre* v. *Parks*, 3 Metc. 207; *Milliken* v. *Pratt*, 125 Mass. 374; *Gay* v. *Rainey*, 89 Ill. 221; *Buchanan* v. *D. Nat. Bank*, 55 Fed. Rep. 223; *W. T. & C. Co.* v. *Kilderhouse*, 87 N. Y. 430.) The trial court erred in excluding the testimony of the witness Bruso. (*Griffiths* v. *M. S. Ry. Co.*, 171 N. Y. 106; *People* v. *Koerner*, 154 N. Y. 355; *Fisher* v. *Fisher*, 129 N. Y. 654; *People* v. *Schuyler*, 106 N. Y. 298.)

*Otto H. Droege* and *J. Lawrence Friedmann* for respondent. There is nothing in the record to show that the contract was not executed in the state of New York. (*L. O. Bank* v. *Judson*, 122 N. Y. 278; *Daley* v. *Brown*, 167 N. Y. 381.) The non-impairment clause of the Federal Constitution has not the slightest application to the present case. (*Holden* v. *M. L. Ins. Co.*, 165 N. Y. 13; *Davis* v. *Supreme Lodge, Knights of Honor*, 165 N. Y. 159.) The testimony of the physician who attended the deceased was properly excluded under sections 834 and 836 of the Code of Civil Procedure. (*B., etc., Co.* v. *Knights Templar*, 126 N. Y. 450; *Davis* v. *Supreme Lodge*, 165 N. Y. 159; *Holden* v. *M. L. Ins. Co.*, 165 N. Y. 13.) The testimony of the witness Bruso, who was a physician attending the deceased in his capacity as physician, was properly excluded. (*Renihan* v. *Dennin*, 103 N. Y. 573; *Grathan* v. *M. L. Ins. Co.*, 24 Hun, 43.)

VANN, J. The deceased was *in extremis*, incapable of acting or deciding for himself, and from the necessity of the case any one was authorized to call a physician to treat him. Without the knowledge or consent of the dying man Dr. Bruso was called for that purpose and for that purpose alone he attended. He found Mr. Meyer, the deceased, in bed in an upper room of a hotel "suffering intense pain and vomiting." Meyer told him to get out of the room, that he did not want him there, but he did not leave. He remained to treat him as a physician, and in order to treat him intelligently tried to find out what the matter was. He learned from Meyer, partly in answer to questions and partly through

5

voluntary disclosures, that he had taken a preparation of
arsenic, known as Rough on Rats, "because he wanted to
die." From this information, and from observation of the
physical symptoms, he decided that Meyer was suffering from
arsenical poisoning. Thus informed as to the nature of the
disease, he at once administered a remedy and soon followed
it by another. The helpless man, without friends to aid or
advise, hopeless of life and courting death, objected and tried
to curse him away from his bedside. The doctor, loyal to the
instincts of his profession, refused to listen to the ravings of
the would-be suicide and continued to prescribe in order to
relieve suffering and prolong life. Upon the trial he was not
allowed to disclose the information acquired under these cir-
cumstances, and we are now to determine whether there was
enough evidence to warrant the trial judge in deciding, as a
preliminary question of fact, that such information was
acquired " in attending a patient, in a professional capacity,"
and that it " was necessary to enable him to act in that
capacity." (Code Civ. Pro. § 834; *Griffiths* v. *Met. St. Ry.
Co.*, 171 N. Y. 106, 111.)

The learned doctor was called as a physician; he attended
as a physician; he made a diagnosis as a physician and he
administered remedies as a physician. In all that he did he
acted in a professional capacity. While it is true that in all
he did he acted against the will and in spite of the remonstrance
of a man whose condition imperatively called for professional
treatment, still the meeting was professional in nature, and
all that he said or did was strictly in the line of his profession.
Was the subject any the less " a patient " within the meaning
and object of the statute, because he was forced to submit to
ministrations designed to save his life? Was the doctor guilty
of assault when he gave the hypodermic injection? Was he
bound to leave him there to die without an effort to help him?
Was the statute designed to protect those only who are
treated by consent, but not those treated through necessity?
Does it not mean by " a patient " at least one who is con-
sciously treated by a physician even without his consent, when

the facts tend to show that through bodily suffering his mind had partially lost its hold ? Do our humane laws make it the duty of a physician to leave the bedside of a dying man, because he demands it, and if he remains and relieves him by physical touch, hold him guilty of assault ? Either Dr. Bruso was the physician of Mr. Meyer or he committed an assault upon him and was guilty of a crime. If the wife of the deceased had called the doctor she would have acted as an agent by implied authority ; the bell boy who in fact called him also acted upon implied authority, and when the doctor came the act of the agent in calling him, if subject to revocation in the actual case, would have been in the supposed case. While the doctor in either case could have retired, if he remained in either he remained as a physician, the sick man became his patient and he was acting in a professional capacity when, as a duly licensed physician, he actually treated Mr. Meyer as a patient. When one who is sick unto death is in fact treated by a physician as a patient even against his will, he becomes the patient of that physician by operation of law. The same is true of one who is unconscious and unable to speak for himself. If the deceased had been in a comatose state when the physician arrived, the existence of the professional relation could not be questioned. The relation of physician and patient, so far as the statute under consideration is concerned, springs from the fact of professional treatment, independent of the causes which led to such treatment. An examination made in order to prescribe establishes the same relation. I am of opinion that Dr. Bruso, who treated the deceased at the hotel, occupied the same confidential relation to him as did the physicians at the hospital. The fact that the patient told the doctor several times to let him alone as he wished to die, expressing himself in a brutal and profane manner, does not, in my judgment, negative the existence of the relation of physician and patient. As was said by Judge EARL in *Renihan* v. *Dennin* (103 N. Y. 573, 578) : " Dr. Bontecon was a person duly authorized to practice physic. Whatever information he had about the condition of the tes

tator he acquired while attending him as a patient. It is true that the testator did not call him or procure his attendance, but he did not thrust himself into his presence or intrude there. He was called by the attending physician and went in his professional capacity to see the patient, and that was enough to bring the case within the statute. It is quite common for physicians to be summoned by the friends of the patient or even by strangers about him, and the statute would be robbed of much of its virtue if a physician thus called were to be excluded from its provisions because * * * he was not employed by the patient nor a contract relation created between him and the patient. . To bring the case within the statute it is sufficient that the person attended as a physician upon the patient and obtained his information in that capacity." So in *People* v. *Murphy* (101 N. Y. 126) it was held that the fact that the physician was selected and sent by the district attorney to attend the patient, after the commission of a crime against her person, did not affect the question.

When a physician is sent by a prosecuting officer to make a report upon the sanity of a prisoner, if he does not treat or prescribe for the subject, the statements of the latter are not protected (*People* v. *Sliney*, 137 N. Y. 570); but even though a physician is sent for the sole purpose of examining as to sanity, if he prescribes for the prisoner during the visit, the relation of physician and patient is thereby created and the disclosures made are within the statute. (*People* v. *Stout*, 3 Parker's Cr. R. 670; *Weitz* v. *Mound City Ry. Co.*, 53 Mo. App. 39; *Freel* v. *Market St. C. Ry. Co.*, 97 Cal. 40; *Colorado Fuel & Iron Co.* v. *Cummings*, 8 Colo. App. 541. See, also, *Grossman* v. *Supreme Lodge*, 6 N. Y. Supp. 821; *Grattan* v. *Metro. Life Ins. Co.*, 24 Hun, 43; *Edington* v. *Mutual Life Ins. Co.*, 67 N. Y. 185.) The fact of treatment is the decisive test in this case. Meyer was treated by the witness as a physician and answered his questions knowing that he was a physician and that he was about to prescribe for him against his will. As was well said by the learned judges of the Appellate Division: " The language (of the statute) is broad enough to cover cases of

medical attendance, whether such attendance results from the voluntary call of the patient upon the physician or from the exigencies of the patient's situation. If the relation is that of a physician attending a patient in a professional capacity, no matter how the relation was brought about, the sections apply."

In *Griffiths* v. *Met. St. Ry. Co.* (171 N. Y. 106), relied upon by the appellant, there was no evidence that the physician acted in a professional capacity, or even that the supposed patient knew he was a physician. The doctor in that case testified that at the time he acquired the information he did not "treat him in any sense as a physician;" that his conversation with him did not relate to his physical condition but was confined "to the method of the accident and that whatever he said was entirely distinct from any treatment or visit of a physician, or anything of that sort;" that while he had rendered "first aid" to the plaintiff in a drug store immediately after the accident when no statement was made, "he did not think the plaintiff knew that he was the physician who treated him at the drug store and that he did not advise him of the fact until after the plaintiff had given him a statement." Judge WERNER, writing for this court, said: "Here there are no facts shown which would warrant the presumption that the relation of physician and patient existed, or that would justify the conclusion that the conversation the doctor was about to give had any relation to professional treatment."

I think that the statute impresses absolute secrecy upon all knowledge acquired by a physician in a sickroom that is necessary to enable him to properly treat the sick person, whether the treatment be with or without his consent. While I agree with Judge GRAY in his conclusion as to the first question considered by him, I differ as to the last and for the reasons stated vote in favor of affirmance, with costs.

GRAY, J. (dissenting). The action was brought to recover against the defendant, a fraternal, mutual benefit corporation, organized under the acts of the Congress of the United States,

upon a certificate of membership issued to Emanuel Meyer; by which it promised to pay, upon his death, to his wife, this plaintiff, the sum of $2,000. The defendant alleged, in defense of the action, that the death of Meyer was the result of suicide; which, within the terms of the agreement of the parties, avoided the certificate. Upon the trial of the issues, the defendant, claiming the affirmative and not questioning plaintiff's preliminary proofs to establish a case under the allegations of her complaint, was allowed to begin with its defense and its evidence was directed towards proving that the beneficiary committed suicide by taking poison. The trial judge submitted to the jury the one question, " whether the deceased committed suicide," and upon their answering " no " to the question, he directed judgment to be entered for the plaintiff. That judgment has been affirmed by the Appellate Division and, upon this appeal, in substance, the general argument of the appellant is that the waiver of the deceased, contained in his application for the insurance certificate, of all provisions of law, then, or thereafter, in force, prohibiting any physician from testifying to any information acquired by attendance upon him, was a part of a contract, which had been validly made in the state of Illinois, and that sections 834 and 836 of the Code of Civil Procedure of this state, under which such testimony is rendered inadmissible, unless the statutory prohibition is waived upon the trial by the personal representatives of the deceased, are inoperative, as being in violation of the provisions of the Federal Constitution, which prohibit legislation in impairment of contracts. The argument, further, is that as to one of the physicians, called upon to testify for the defense, his testimony, certainly, did not come within the statutory prohibition; inasmuch as the necessary relationship of physician and patient did not exist.

With respect to the first of these questions raised by the appellant, whatever other answers might be made to the applicability of the provision of the Federal Constitution relied upon, it is sufficient to say, now, that this contract was consummated in the state of New York and is to be governed,

in its enforcement, by the laws of that state. The beneficiary was a resident of this state and there made his application for the insurance. The certificate, issuing upon the application, appears, from its language only, to have been signed by the officers of the defendant at Chicago, in the state of Illinois, on September 20th, 1894; but upon it was printed the following clause: "I hereby accept this certificate of membership subject to all the conditions therein contained," and that had the signature of the applicant, followed by the words, "Dated at New York, this 28th day of September 1894, attest: Louis Riegel, Secretary Section 2179, Endowment Rank, K. of P." By the terms of the certificate, the agreement of the defendant was subject, not only to the conditions subscribed to by the member in his application, but "to the further conditions and agreements hereinafter named," and the clause containing his acceptance, above quoted, was one of those "further agreements." From these terms of the agreements of the parties the only natural conclusion is that the place of the contract was where it was intended, and understood, to be consummated. Its completion depended upon the execution by the member of the further agreement indorsed upon the certificate: namely, to accept it "subject to all the conditions therein contained." The contract was not completed, in the sense that it was binding upon either party to it, until it was delivered in New York after the execution by the member of the further agreement expressing his unqualified acceptance of its conditions. As matter of fact, the promise of the defendant was to pay the insurance moneys to the plaintiff, who resided in New York; a feature giving additional local coloring to the contract. But the sufficient and controlling fact is that, by its terms, it was first to take effect as a binding obligation, when the required agreement on the part of the member was executed by him.

The difficulty in this case, which, in my judgment, entitles the defendant to a new trial in the action, is the exclusion of the evidence of Dr. Bruse, called as a witness for the defendant and asked to state a conversation had with Meyer, the

deceased. This witness was a physician, having his office in the city of Buffalo, in this state, near to the Iroquois Hotel. He testified that, in the early morning, one of the bell boys of the hotel came for him and, upon entering one of the rooms, he found a man in the bed, suffering from pain and vomiting. Objection being made to his evidence, which was in the form of a deposition, the court put the question : " Did this doctor treat him." The defendant's counsel replied : " He inserted something hypodermically into the man against his wish." The objection to the testimony was sustained, the defendant excepted and the whole deposition of the witness was excluded, under the previous ruling of the court that sections 834 and 836 of the Code of Civil Procedure applied. From the deposition, thus offered and excluded, it appeared that the witness had a conversation with Meyer, which was narrated, so far as material, as follows : " I asked him what he had been doing and he told me it was none of my damned business, that he didn't want me in there and he wanted me to get out of there. * * * I looked around the room. * * * I found * * * a box of ' Rough on Rats ' * * * empty. * * * He told me he had taken it * * * because he wanted to die * * * he didn't want to get well * * * he didn't want me to do anything. * * * I prepared a hypodermic injection * * * and stimulated him, so he would not die in the Hotel Iroquois. * * * When I was going to give him the hypodermic, he said ' You, (cursing him in foul language), keep away from here. Didn't I tell you before to keep away ? ' I paid no attention to him and gave him the hypodermic." The witness was, then, asked if he knew what was the cause of the condition of the man and he answered, that it was arsenical poisoning and that the symptoms evidenced it. The deceased was immediately conveyed from the hotel to the hospital; where he died soon afterwards. The evidence of Dr. Bruso was deemed inadmissible under the provisions of section 834 of the Code ; which prohibits a physician from disclosing " any information which he acquired in attending a patient, in a

professional capacity, and which was necessary to enable him to act in that capacity." The agreement of the insured, contained in his application, which waived for himself, his representatives and beneficiaries, " any and all provisions of law, now or hereafter in force, prohibiting  *  *  *  any physician  *  *  *  attending me  *  *  *  from disclosing, or testifying to, any information acquired thereby " and which expressly consented to such testimony being given in any suit, was held below to be insufficient to meet the requirement of section 836 of the Code, that the provisions of section 834 must be expressly waived upon the trial by the personal representatives of the deceased patient. Such a waiver was refused at this trial. Our recent decision in *Holden* v. *Metropolitan Life Ins. Co.*, (165 N. Y. 13) justified the ruling below upon the question of the force of the waiver in the insurance contract. Theretofore, it had been the rule to regard such a waiver as a binding part of the contract of insurance and, as such, available to the insurer in any action upon the policy. (*Foley* v. *Royal Arcanum*, 151 N. Y. 196.)

But was there disclosed that relationship of physician and patient between the deceased and Dr. Bruso, which made operative the prohibitory provisions of section 834 ? As the inadmissibility of such testimony is, only, because of the statute, it is quite important that the case should come very clearly within its terms; however liberal the construction, which we should give to an enactment intended to promote the ends of justice. The object of this legislation was to render privileged what communications are made between a physician and his patient; but, obviously, it is essential that it shall appear that the person attended is his patient, in the sense in which such a term is ordinarily understood. In *Griffiths* v. *Metropolitan Street Railway Company*, (171 N. Y. 106), we, quite lately, had occasion to consider such a question under a state of facts not, essentially, dissimilar to that now before us. In that case the plaintiff brought his action to recover damages for injuries sustained through the negligence of the defendant's servant, a gripman upon one of its

cars.   The defendant called a physician, as a witness, who was
at the scene of the accident, when an ambulance arrived, and
who rendered "first aid" to the plaintiff.   The witness was,
also, an attending physician at the hospital, to which the plain-
tiff was assisted by him in the ambulance ;. but he rendered no
further services to him while in the hospital.   The witness
was asked to relate a conversation, which he had with the
plaintiff in the hospital, subsequently ; but the court sustained
an objection to its admissibility under section 834 of the Code
and the witness was not allowed to testify to what was said by
plaintiff with reference to his sufferings, or to the accident.
When the case reached this court, it was held that the exclu-
sion of the physician's evidence was an error; for which the
judgment should be reversed and a new trial had.   The deci-
sion by this court rested upon the ground that the burden
upon the plaintiff of showing that the evidence was within the
statutory prohibition had not been met and that the facts did
not warrant the presumption that the relation of physician and
patient existed.   The opinion, quite fully, reviewed the cases,
illustrating the application of the statutory provision in ques-
tion, and the rule was distinctly adhered to that, to warrant
the application, it must appear that the relation of physician
and patient, at the time, existed and that the information
sought to be excluded was necessary to enable the physician
to act as such.   Previous to the *Griffith's* case that rule had
been expressed in *People* v. *Koerner* (154 N. Y. 355).

Can we say that the rule applies to such a situation, as that
disclosed in this case, any more than it did in *Griffiths'* case ?   I
think not.   It seems to me to be difficult to assert, with any
gravity of countenance, at least, with Meyer rejecting the wit-
ness' presence and services, and cursing him for his interference,
and with the witness' determined efforts to prevent Meyer from
dying in the hotel, whose servants had summoned him, that
the relation of physician and patient arose, and that the con-
fidential relation existed, which the statute has in view and
which, with a tender solicitude for a patient's interests, it is
designed to safeguard.

The inadmissibility of the testimony of the hospital physicians rests upon a different basis.    Both may, reasonably, be said to have been in attendance upon him as a hospital patient; but, in my opinion, the deposition of Dr. Bruso was erroneously excluded and, therefore, I advise the reversal of the judgment.

O'BRIEN, BARTLETT and MARTIN, JJ., concur with VANN, J.; PARKER, Ch. J., concurs with GRAY, J.; WERNER, J., absent.

Judgment affirmed.    _____