EDSON v. HAMMOND.

(Supreme Court, Appellate Division, First Department.   February 3, 1911.)

**1. WORK AND LABOR (§ 4*)—SERVICES.**

Where a physician rendered services to a patient, either on an express employment or with his consent, the law raises an implied promise on the part of the patient to pay him what the services are reasonably worth.

[Ed. Note.—For other cases, see Work and Labor, Cent. Dig. §§ 3–7; Dec. Dig. § 4.*]

**2. WORK AND LABOR (§ 4*)—SERVICES.**

Where, in a proper case, a physician rendered services to a person without his request or consent, or where one is injured by an accident rendering him unconscious, the law will imply a promise from him who received the benefit of the services to pay for them.

[Ed. Note.—For other cases, see Work and Labor, Cent. Dig. §§ 3–7; Dec. Dig. § 4.*]

**3. INSANE PERSONS (§ 74*)—SERVICES.**

Plaintiff, a physician, rendered services to defendant, at the request of a physician in attendance. Defendant had a regular physician. When plaintiff was called, defendant was unconscious from insanity, but the unconsciousness lasted only two days, and the plaintiff continued the services after that. Held, that the plaintiff was not entitled to recover as on an implied contract.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 126, 127; Dec. Dig. § 74.*]

Laughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by David O. Edson against James B. Hammond. From a judgment for plaintiff, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, LAUGHLIN, and DOWLING, JJ.

Neal D. Becker, for appellant.

Robert D. Murray, for respondent.

DOWLING, J.   In April, 1907, Thomas Hammond sought to have his brother, the defendant herein, adjudged a lunatic, and presented his petition to that end in the Supreme Court.   To take charge of the medical side of the case, Dr. Pearce Bailey, an alienist, was employed by Thomas Hammond, and Dr. Bailey employed many other alienists who acted under his direction, reported to him, and were active in the examination of defendant in the effort to secure evidence of his alleged insanity.   On April 23, 1907, the defendant was arrested at his apartments in the Cumberland Hotel in this city, and after a hearing committed to Bellevue Hospital, whence he was afterwards transferred to a private sanitarium, known as Wiley's, in this city. While he was there he became ill, and although he had his own physician, Dr. Franklin Burke, the latter was not notified to attend him, but Dr. Pearce Bailey on May 3, 1907, called upon Dr. Edson, the plaintiff herein, to visit the defendant and attend him professionally,

he being then informed by Dr. Bailey that his new patient was accused of being a lunatic. Dr. Edson says that he "was called on to see Mr. Hammond by a physician who was in attendance," but concededly Dr. Bailey was the physician referred to, and it is not claimed that he ever treated defendant professionally, but he was connected with the case solely as Thomas Hammond's chief expert in the lunacy proceedings. Dr. Edson found defendant unconscious when he called upon him, and, having made his diagnosis, was told by Dr. Bailey to continue his treatment of the case, which he did. The defendant remained unconscious for about two days. Thereafter plaintiff continued visiting defendant professionally throughout May and June, making 58 visits in May and 29 in June, the last being on June 30th, and also made 2 blood examinations and 4 urinary examinations. On June 24, 1907, during the period when plaintiff claims to have been acting as defendant's physician, he made the following affidavit:

"Supreme Court, New York County.

"In the Matter of James Bartlett Hammond, an Alleged Incompetent Person.

"State of New York, County of New York—ss.:

"David Orr Edson, being first duly sworn, says: I am the physician in immediate charge of James Bartlett Hammond, the alleged incompetent in this proceeding, and I have been in such charge of him for about six weeks. During that time Mr. Hammond has improved physically very much; but he is now demented, and in my opinion hopelessly so. He goes out to drive frequently, and on such occasions insists at stopping at saloons to get liquor, and is only restrained by the nurses who are present with him. He is wholly unfit to take care of himself, and never will be in my judgment. It is, however, of great importance that Mr. Hammond should at as early a date as possible be moved to the country, where the fresh air and quiet will be of great advantage to him. It is not possible to keep moving him back and forth from the country in order to have his presence at hearings, and for any other purpose, without great risk to his health. His present surroundings during hot weather are sure to militate against such small recovery in physical condition as is possible in this case. David Orr Edson, M. D.

"Sworn to before me this 24th day of June, 1907.

"Miltfor Bishop, Notary Public, New York County."

He presented himself as a witness in the lunacy proceedings, and testified in response to questions put by the petitioner's attorney as to defendant's physical condition, but was not allowed to testify as to his mental condition. Thereafter a bill was rendered by plaintiff to defendant for $930, apparently in October, 1907, and, that not having been paid, a further bill was rendered to Thomas Hammond on December 7, 1907, "for professional services rendered," consisting of the same items making up the $930, with additional charges of $300 for "3 days in court," and $200 for "1 day in court called from Manchester, Vt." Plaintiff now brings this action to recover $930, and has had a verdict for $555. The complaint alleges that the services were rendered "at the request of the defendant."

Concededly the defendant never made any request that plaintiff attend him, either to plaintiff or to any other person, nor did defendant promise to pay plaintiff for his services, nor make any payment on account of his bill. Liability is sought to be predicated upon the theory that, when a physician is called by a third person to attend a patient in a serious condition, he can recover from the patient when

his services are accepted without objection, and that this is so even when the patient is unconscious and therefore not able to acquiesce. This proposition is sought to be sustained by two cases. In Sceva v. True, 53 N. H. 627, the action was brought to recover for the support of defendant during a period of 40 years, during nearly all of which time she had been living under the same roof with plaintiff's intestate (who was her brother-in-law), practically as a member of his family, and during all of which time she was hopelessly insane. No guardian had ever been appointed for her, no contract was made for her support, and the funds therefor came partly from plaintiff's intestate and his wife, and partly from the proceeds of the use of certain real estate in which defendant was interested under her father's will. At the time of the commencement of the action defendant was in a private asylum as an insane poor person. There was no question that the support furnished her was necessary and proper. The court said:

"We regard it as well settled * * * that an insane person, an idiot, or a person utterly bereft of all sense and reason by the sudden stroke of accident or disease, may be held liable in assumpsit for necessaries furnished to him in good faith while in that unfortunate and helpless condition. And the reasons upon which this rests are too broad, as well as too sensible and humane, to be overborne by any deductions which a refined logic may make from the circumstances that in such cases there can be no contract or promise in fact—no meeting of the minds of the parties. The cases put it on the ground of an implied contract; and by this is not meant, as the defendant's counsel seems to suppose, an actual contract—that is, an actual meeting of the minds of the parties, an actual, mutual understanding, to be inferred from language, acts, and circumstances by the jury—but a contract and promise said to be implied by the law, where, in point of fact. there was no contract, no mutual understanding, and so no promise. The defendant's counsel says it is usurpation to hold as a matter of law that there is a contract and a promise, when all the evidence in the case shows that there was not a contract nor the semblance of one. It is doubtless a legal fiction, invented and used for the sake of the remedy. If it was originally usurpation, certainly it has now become very inveterate and firmly fixed in the body of the law."

The court therefore held that this legal fiction furnished sufficient basis in law for the claim for necessaries of life furnished to a lunatic.

This case furnished the basis for the opinion in Cotnam v. Wisdom, 83 Ark. 601, 104 S. W. 164, 12 L. R. A. (N. S.) 1090, 119 Am. St. Rep. 157, wherein it was held that a surgeon could recover the value of his services rendered a person thrown from a street car and thereby rendered unconscious, which services were rendered at the request of a spectator of the accident. The other cases in which the question of liability arose were ones where the action was brought against a person summoning a physician for a third person. The general rule deducible from these cases is thus stated:

"Where a physician renders services to a patient, either under an express employment or with his consent, the law raises an implied promise on the part of the patient to pay him what the services are reasonably worth. So, also, where in a proper case a physician renders services to a person without his request or consent, or where one is injured by an accident rendering him unconscious, the law will imply a promise from him who received the benefit of the services to pay for them." 30 Cyc. 1596.

The last sentence quoted rests on the authority of Cotnam v. Wisdom, supra, and Pray v. Stinson, 21 Me. 402. In the last-named case a seaman had been taken ill with yellow fever in the port of Havana, and, despite his desire to go on shore, he was treated on board by a physician from the city. The laws of Cuba then imposed a considerable forfeiture if a seaman died on board a vessel without having a physician from the port to attend upon him. The court said:

"It appears to have been a proper case for medical advice, and the physician appears to have been called because the danger was such that the laws of the place, as well as the feelings of humanity, required that he should be. And under such circumstances the law will require a promise from him who has received the benefit of the services to pay for them."

In the case at bar, however, even the doctrine of the Arkansas and Maine cases would not warrant a recovery beyond the services rendered on the two days when defendant was unconscious; nor would it seem to justify a recovery for physician's services rendered to one accidentally injured, even if rendered unconscious, where immediate attention is not required, and particularly in a city where a free ambulance service exists, and where free hospital treatment is furnished by the municipality. The natural course there to pursue is to call upon the gratuitous service thus provided, and the rule founded on the necessity and humanity of other cases does not apply.

As to the other visits, liability is sought to be attached on the ground that defendant did not protest against, or object to, the attendance of plaintiff. To establish this liability, three things should have concurred: (1) Defendant should have known that plaintiff was attending him professionally. (2) He should have been in such a condition, mentally and physically, that he was free to object or protest. (3) He should have either expressed his assent to plaintiff's attendance or failed to object thereto. As to the first requirement, it appears that defendant was constantly being visited at the sanitarium by physicians in the employ of his brother, engaged as alienists to examine into his mental condition. The names of nearly 20 such alienists appear as having then visited and examined him, and defendant says they all felt his pulse, looked at his tongue, examined the nurse's record and talked with him, many of them leaving medicines for him, and most of them wanting him to take medicines. He could not protest against their presence, for he was in restraint and under observation, even though he was allowed to drive out with his attendants. There is no proof that he ever regarded plaintiff as anything else than one of these alienists, hostile to him, whose visits he was required to receive. There is no proof that the samples of blood and urine submitted for examination were obtained with his knowledge, or that he knew of the use to which they were to be put. Plaintiff never spoke to him in regard to his attendance upon him. Defendant had his own physician, Dr. Burke, who, as defendant had been informed, had called to see him at Bellevue Hospital, and who, as Dr. Bailey admits, asked to be allowed to treat defendant for his ailments at the sanitarium, but this request was never communicated to defendant. Defendant, knowing that he had a doctor of his own in whom he had confidence, may well have regarded all the rest as simply experts engaged in the deter-

mination of his sanity. Plaintiff and Dr. Bailey both say that defendant said plaintiff had saved his life, but that is denied by defendant. Upon this record, it cannot be said that defendant ever knew that plaintiff was attending him professionally. As to the second requirement, the fact that defendant was under restraint and that he was required to permit the visits of all these physicians, as well as his then mental condition, might furnish reason for the failure to protest. He was not told that his own physician was trying to visit him, nor does it appear that he had any knowledge that he was physically ailing. As to the third requirement, it is conceded that he never verbally ratified plaintiff's employment, nor did he protest against the same, which is explained by the discussion of the two preceding requirements.

It seems clear upon this record that plaintiff, actually employed by Dr. Bailey (who had been employed by Thomas Hammond or his attorney to take charge of the proceedings in lunacy in opposition to what defendant believed to be his best interest), never regarded himself as defendant's physician. Had he believed himself to be acting in that capacity, he never would have made the affidavit before set forth, nor appeared as a witness against his patient on the hearing, nor been in conference about defendant's condition with Dr. Bailey. Upon plaintiff's own testimony, defendant was hopelessly demented during all the time he attended him, and was so upon the trial of this very action, despite the judicial determination to the contrary. No necessity for the rendition of his services appears, for defendant had a physician ready to attend him, in spite of which he was not allowed so to do, but another, Dr. Lambert, was called into consultation by plaintiff.

In the foregoing discussion there has not been overlooked the fact that, where a request is made for a physician's services, a special rule as to the liability of third persons exists. As it is stated in 30 Cyc. 1597:

"The rule that where a person requests the performance of a service, and the request is complied with and the service performed, there is an implied promise to pay for the services, does not apply where a person requests a physician to perform services for a patient, unless the relation of that person to the patient is such as raises a legal obligation on his part to call in a physician and pay for the services, or the circumstances are such as to show an intention on his part to pay for the services; it being so understood by him and the physician."

This is in accord with the rule laid down in Crane v. Baudouine, 55 N. Y. 256, and MacGuire v. Hughes, 126 App. Div. 637, 111 N. Y. Supp. 153. But we are not now concerned with the question of who is responsible for payment for plaintiff's services, save in so far as we are called upon to determine that, upon the record, defendant is not responsible. Nor is the situation changed by such cases as Meyer v. Knights of Pythias, 178 N. Y. 63, 70 N. E. 111, 64 L. R. A. 839, holding that the professional privilege existed to a sufficient extent to prevent the divulgence of information acquired by a physician called in by a third party to attend a person in a comatose state.

Upon the proof now before us, defendant never made any express agreement to pay for plaintiff's services, never employed him as a physician, never knowingly ratified his employment or accepted his

services, and never became so possessed of knowledge of the nature and extent of plaintiff's attendance upon him as to be called upon to object to or protest against the same, or in default thereof to be deemed to have acquiesced therein.

The judgment and order appealed from must therefore be reversed and a new trial ordered, with costs to appellant to abide the event.

INGRAHAM, P. J., and McLAUGHLIN and SCOTT, JJ., concur.

LAUGHLIN, J. (dissenting). I am unable to agree with the majority of the court with respect to the inferences to be drawn from the evidence herein, and to the application of the adjudicated cases.

I am of opinion that the case falls within the rule, which I deem well sustained both on principle and by authority, that one who has met with an accident or becomes ill and through unconsciousness or otherwise is unable to act for himself is liable on the theory of an implied contract for necessary medical aid and attendance, no matter by whom summoned, and when, as here, after regaining consciousness, he knowingly voluntarily continues to receive and accept the professional services of the physician summoned, the reasonable value thereof may be recovered of him. Cotnam v. Wisdom, 83 Ark. 601, 104 S. W. 164, s. c. 12 L. R. A. (N. S.) 1090, 119 Am. St. Rep. 157, note; Pray v. Stinson, 21 Me. 402; 30 Cyc. 1596, 1597. See, also, Meyer v. Knights of Pythias, 178 N. Y. 63–67, 70 N. E. 111, 64 L. R. A. 839; MacGuire v. Hughes, 126 App. Div. 637, 111 N. Y. Supp. 153; Van Gaasbeek v. U. S. Lace Curtain Mills, 132 App. Div. 595, 116 N. Y. Supp. 776; Crane v. Baudouine, 55 N. Y. 256; Sceva v. True, 53 N. H. 627; Raoul v. Newman, 59 Ga. 408.

It now appears that the defendant was not insane. The restraint to which he was subjected did not deprive him of volition to accept or reject the plaintiff's services, to which he at no time objected, and he did not request that his former physician be called. The fact that theretofore he had been attended by a physician of his own selection is therefore of no importance. He took advantage of the privilege afforded by the statute, and obtained rulings of the court which precluded plaintiff from showing what he treated him for. But for that it might have very closely appeared that defendant well knew that plaintiff was not visiting him as an alienist, and therefore the argument that the appearance indicated to defendant that plaintiff was there to observe him as an expert is without weight. Moreover, the jury were justified in finding that defendant knew that plaintiff was visiting and treating him as a physician, and that defendant, referring to the professional services for which recovery is sought, frequently admitted that plaintiff had saved his life, and thanked him for it, which showed conscious knowledge on his part of the rendition and acceptance of the services. Neither the fact that plaintiff made an affidavit for use in the lunacy proceeding, nor that he was mistaken with respect to the seriousness of defendant's mental condition, deprives him of the right to recover the fair value of the professional services rendered.