### SCHOENBERG v. ROSE et al.

(Municipal Court of City of New York, Borough of Manhattan, Sixth District. February 9, 1914.)

1. PHYSICIANS AND SURGEONS (§ 24*)—ACTION FOR COMPENSATION—EVIDENCE.
     In an action by a physician against the estate of a deceased to recover for medical services rendered deceased after he had suddenly fallen unconscious, evidence of the value of the estate of deceased was properly admitted, since, though, while the financial condition of a patient does not alone affect the abstract question of the value of the services, it is a proper element entering into the question as to what charge shall be made by him by reason of such financial condition.
     [Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. §§ 53–62; Dec. Dig. § 24.*]

2. PHYSICIANS AND SURGEONS (§ 23*)—ACTION FOR COMPENSATION—EVIDENCE.
     Where, in an action by a physician against the estate of a deceased for medical services rendered deceased in an emergency after he had fallen unconscious, the evidence showed that the physician worked with the deceased in the usual way 15 or 20 minutes, trying to produce artificial respiration, $15, and not $500, was reasonable compensation, taking into consideration the value of the estate, the nature of the services, the experience of the physician, and the testimony of experts as to what was a reasonable compensation for such services.
     [Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 52; Dec. Dig. § 23.*]

3. PHYSICIANS AND SURGEONS (§ 13*)—SERVICES RENDERED IN EMERGENCY— RIGHT TO COMPENSATION.
     The president and secretary of a corporation were, during the pendency of a trial against the corporation, in a courtroom, when the president became suddenly sick and fell unconscious to the floor. The secretary and counsel for the corporation called for a doctor, whereupon plaintiff, who was in the courtroom, responded and rendered medical assistance. *Held*, that the fact that the secretary and counsel summoned plaintiff did not render them liable for the services, since they, being under no legal obligation to furnish medical services to the deceased, occupied the relation of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mere strangers, but deceased, under an implied contract, was liable for the reasonable value of the services.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. §§ 18–20; Dec. Dig. § 13.*]

Action by Mark J. Schoenberg against William R. Rose and others, executors of Max E. Bernheimer, deceased. Judgment for plaintiff.

Bertha Rembaugh, of New York City, for plaintiff.
Rose & Paskus, of New York City (William R. Rose and Norman P. S. Schloss, both of New York City, of counsel), for defendants.

MARKS, J.   Mr. Max E. Bernheimer, president, and Mr. Freeland, secretary, of a corporation, on September 24, 1913, were in attendance at the Supreme Court, Brooklyn, in an action then on trial in which the corporation was the defendant.

The plaintiff in this action, a physician in practice in this state for 12 years, earning a good income and making a specialty of treating the eyes, ears, nose, and throat, was also in attendance, as a witness on behalf of the plaintiff in that action, and, while he was testifying, Mr. Bernheimer fell from a chair in the courtroom to the floor, unconscious.

Counsel who were defending the corporation in that suit and Mr. Freeland said, "Get a doctor;" and the plaintiff asked permission, of the justice presiding, to leave the witness chair, which was granted. The plaintiff went towards where Mr. Bernheimer was, and said, "I am a physician," to which Mr. Freeland, probably laboring under great excitement and anxiety for his friend, and perhaps with some momentary feeling of hostility or resentment towards the doctor, an adverse witness, replied, "The hell you are; you are an oculist; what we want at a time like this is physicians, not oculists;" and then Mr. Freeland left the courtroom with others to summon an ambulance, and also to obtain a pulmotor.

Dr. Shook, another physician, who was also in attendance at the time, and also as a witness for the plaintiff, was nearest to Mr. Bernheimer, and thereupon he and the plaintiff in this action proceeded to give what they considered proper treatment.   They loosened the clothes of Mr. Bernheimer and first made an examination of his heart, lungs, and pulse, and then both physicians proceeded to make or cause artificial respiration, which was done, the plaintiff testified, by getting hold and grasping the arms above the elbows and pulling them upwards, and then bringing them downward and pressing against the chest, doing that regularly about every two seconds, and taking hold of the legs and bringing them upwards and pressing them against the abdomen and releasing them again, and next to grasp the tongue and pull it away out and let it back, doing these things in rhythmic movement.

There were signs of life in Mr. Bernheimer when plaintiff started his treatment, which treatment he claims continued from 30 to 45 minutes, and at the end of the artificial respiration he and Dr. Shook decided Mr. Bernheimer was dead.   He died without having regained consciousness.   A day or two days after this, the plaintiff sent a bill

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for $500, which the executors refused to pay, and this action is brought against them to recover that amount claimed by plaintiff to be the value of the services.

[1] The deceased left a very large estate, evidence as to the value of which was received over the objection of the defendants' counsel. I am of the opinion that, while the financial condition of a patient does not alone affect the abstract question of the value of a physician's services, it is a proper element entering into the question as to what charge or what reduction in the charge shall be made by him by reason of such financial condition. · Lange v. Kearney, 4 N. Y. Supp. 14,[1] affirmed 127 N. Y. 676, 28 N. E. 255. So a patient of no means, or of limited means, may prove that his circumstances and station in life are such as to render a physician's charge exorbitant and out of all reason and proportion to the patient's ability to pay, while the same charge to a person of large means would not be considered unreasonable.

The financial condition of a patient is an element that it may be assumed is considered by both physician and patient when the services are contracted for, rendered, and accepted, and may also be considered by the court in determining the reasonableness of the charge; and that element should apply to a case where there is and was no contract, but a mere fiction of the law creating one, else, in a case where services are rendered to an unconscious man who never recovers, the charge against his estate might be so great and unreasonable as to be out of all proportion to the value of the estate. This charge a man who recovers could resist and successfully defend by showing his limited means, and, in the case of an unconscious man who does not recover, such value is an aid to the court in fixing the reasonableness of the claim, whether made against a large or a small estate.

Therefore the evidence as to the value of the deceased's estate was properly allowed and properly taken into consideration, and that, together with the experience of the physician as such, and the nature and difficulty or easiness of the case, and what is considered by him and by other physicians an ordinary or reasonable charge for the services, are the proper elements upon which a judge or jury may act in fixing the value of the services.

[2] But the services performed here were not difficult. They did not require any special degree of skill or knowledge, nor were they of such a character that it required a physician of years of experience or study to perform them properly. They consisted of what a medical student could perform as well as a physician of years of experience.

It is not uncommon to find laymen experienced in giving prompt or what is called "first" aid to the injured, who can do this work as well as a physician. The plaintiff testified that the treatment described by him, which he gave, was the usual and well-known method.

There is some dispute as to the exact minute that Mr. Bernheimer died, and consequently the plaintiff's claim that he treated the deceased between 30 and 45 minutes is also disputed. It is not necessary to

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 51 Hun, 640.

measure the plaintiff's services by the fraction of a minute, but I should say, from the evidence, he was engaged, in the manner testified to by him, 15 to 20 minutes.

Dr. Shook, who also presented a bill for $500 for his services, and another physician testified for the plaintiff that $500 was the value of plaintiff's services, while experts called for defendants placed the value at from $10 to $15; one stating that a fair charge would be from nothing up to a maximum of $15.

[3] Who is liable for the services, if any one? The rule that where a person requests the performance of a service, and the request is complied with, and the service performed, there is an implied promise to pay for the service does not apply to a case where a person requests a physician to perform services for a patient, unless the relation of that person to the patient is such as to raise a legal obligation on his part to call in a physician and pay for the services, or the circumstances are such as to show an intention on his part to pay for them. Cyc. vol. 30, p. 1597.

Although Mr. Bernheimer was the president and Mr. Freeland the secretary of the corporation defending the suit in the Supreme Court, neither that relation or the friendship existing between them, or their business interests, or the fact claimed here, that there was no relative of the deceased present at the time, placed Mr. Freeland, or any of the counsel engaged in defending the corporation, under any obligation to supply medical attendance for the deceased, or rendered him or them liable for payment for the services rendered, because they or either of them called for a physician, as there was no understanding between the plaintiff or any of the persons calling for a physician that either of them would pay for the services. Crane v. Baudouine, 55 N. Y. 256; Macguire v. Hughes, 126 App. Div. 637, 111 N. Y. Supp. 153; s. c., 207 N. Y. 516, 101 N. E. 460; Van Gaasbeek v. United States Lace Curtain Mills, 132 App. Div. 595, 116 N. Y. Supp. 776. Mr. Freeland and counsel in that case stand in the same position as strangers or spectators, so far as their liability is concerned.

In my opinion this case falls within the rule that one who becomes ill, and through unconsciousness or otherwise becomes incapable of acting or deciding for himself, is liable on the theory of an implied contract or promise that, having received the benefit of necessary medical aid and attendance, he must pay for them, no matter by whom the physician was summoned to perform them; and, from the necessity of the case, any one is authorized to call a physician to treat him, without liability on the part of the person so calling the physician. Cotnam v. Wisdom, 83 Ark. 601, 104 S. W. 164, 12 L. R. A. (N. S.) 1090, and note, 119 Am. St. Rep. 157, 13 Ann. Cas. 25; Sceva v. True, 53 N. H. 627; 30 Cyc. 1596, 1597; Meyer v. Knights of Pythias, 178 N. Y. 63–67, 70 N. E. 111, 64 L. R. A. 839.

The plaintiff could have proceeded to treat the deceased, if no one had called him or called for aid, and recover for his services. Mr. Freeland was a stranger to the deceased in the sense that he was under no legal obligation to supply medical attendance, and, where a man is in extremis, it is the duty of a physician to treat that man, regard-

less of the interference of strangers; and the language or opinion of Mr. Freeland, after he and counsel called for aid, that the plaintiff's services were not welcome or desirable, or that the plaintiff had not the ability to treat the deceased because he was a specialist in eye diseases, or an oculist, putting that as the strongest interpretation of the language hastily used by Mr. Freeland at the time, did not justify the plaintiff in neglecting to render aid or defeat his right to a recovery therefor, or warrant him in assuming that the sick man, through the agency of Mr. Freeland, did not desire the services.

Mr. Bernheimer was in a comatose state when the call for a physician was made in the courtroom and remained, during plaintiff's treatment, unconscious until his death, and this established the professional relation of physician and patient.

"When one who is sick unto death is in fact treated by a physician as a patient, even against his will, he becomes the patient of that physician by operation of law. The same is true of one who is unconscious and unable to speak for himself." Meyer v. Knights of Pythias, 178 N. Y. 63–67, 70 N. E. 111, 112 (64 L. R. A. 839).

In the case cited, the patient objected to the physician's treatment and tried to curse him away from his bedside, but the doctor refused to listen to the ravings of the patient, who had attempted to commit suicide, and continued to prescribe for him in order to relieve suffering and prolong life, and it was held that although a stranger, a bell boy, had called the physician without the knowledge or consent of the dying man, yet the relation of patient and physician was established, so that the doctor was prohibited from disclosing any information received by him while treating the patient. If, as held by the Court of Appeals, the relation of physician and patient is established against the will of a conscious man in extremis, and that the same rule applies to the case of an unconscious man, then all the rights, duties, and liabilities of each to the other attach, among which, on the part of the physician, are that he will exercise reasonable care and skill in treating the patient, and that he is chargeable with knowledge of the consequences of his neglect or unskillfulness or failure to exercise reasonable care and skill, and the implied contract on the part of the patient to pay for the services rendered, and a stranger, under no obligation to supply medical attendance, cannot, by any interference, act, or declaration, prevent that relation springing into existence by operation of law, when the physician proceeds to treat the patient, over the protests or objections from such stranger.

In Sceva v. True, supra, the court said:

"We regard it as well settled  *  *  *  that an insane person, an idiot, or a person utterly bereft of all sense and reason by the sudden stroke of accident or disease may be held liable, in assumpsit, for necessaries furnished to him in good faith while in that unfortunate and helpless condition. And the reasons upon which this rests are too broad, as well as too sensible and humane, to be overborne by any deductions which a refined logic may make from the circumstances that in such cases there can be no contract or promise, in fact, no meeting of the minds of the parties. The cases put it on the ground of an implied contract; and by this is not meant, as the defendants' counsel seems to suppose, an actual contract (that is, an actual meeting of the minds of the parties, an actual mutual understanding, to be inferred from language,

acts, and circumstances, by the jury), but a contract and promise, said to be implied by the law, where, in point of fact, there was no contract, no mutual understanding, and so no promise. The defendant's counsel says it is usurpation for the court to hold, as a matter of law, that there is a contract and a promise, when all the evidence in the case shows that there was not a contract, nor the semblance of one. It is doubtless a legal fiction, invented and used for the sake of the remedy. If it was originally usurpation, certainly it has now become very inveterate, and firmly fixed in the body of the law."

The court, therefore, held that this legal fiction furnished sufficient basis in law for the claim for necessaries of life furnished a lunatic.

In Cotnam v. Wisdom, supra, a person was injured by being thrown from a street car. While he was unconscious, plaintiffs, who were physicians and surgeons, were summoned by a spectator to render aid. They performed an operation in the hope of saving his life, but the operation was not successful, and the patient died. It was held that the physicians could recover from the estate of the deceased the value of their services; and the case of Sceva v. True, supra, is quoted from at length, as the basis of the opinion.

My attention has not been called to any case in this state where the question was presented as to the right of a physician to recover from a patient or his estate for services rendered to him while unconscious, or in extremis, when called by a stranger or spectator to treat the patient, or where the physician acts of his own volition; and counsel agree there is none in this state that can be cited as authority for either the plaintiff or defendants.

I am unable to draw a distinction as to the right of recovery between a case where the doctor is called by a stranger or spectator and one where he proceeds to treat such a case without being asked to do so. The right to recover in both cases is the same, and the argument to support such right could be carried to great length.

"The reasons upon which this rests are too broad, as well as too sensible and humane, to be overborne by any deductions which a refined logic may make from the circumstance that in such cases there can be no contract or promise." Sceva v. True, supra.

See, also, Sherman's Estate, 6 Pa. Co. Ct. R. 225; Robbins v. Town of Homer, 95 Minn. 201, 103 N. W. 1023; Richardson v. Strong, 35 N. C. 106, 55 Am. Dec. 430; Patterson v. Patterson, 59 N. Y. 574, 17 Am. Rep. 384; Raoul v. Newman, 59 Ga. 409; Meisenbach v. Southern Cooperage Co., 45 Mo. App. 232.

In my opinion there is an implied contract in both cases, and, if the physician chooses to stand upon his legal rights to recover, he is entitled to enforce those rights and must receive what his services are reasonably worth, regardless of what may be considered the ethics of the medical profession in such a case, with which the court is not concerned. Duty requiring him to give his aid, and having given it, he may expect payment by reason of the promise created by law from the patient to do so, although he never asked for the aid or consented to it being given. In an emergency case, requiring immediate attention to save life, the physician when called, or when he volunteers his services, should not stop to inquire by whom he will be paid, or to make it known that he expects to be paid. It would be an inhuman act to do

so or to give that subject a thought; and, while the question whether or not the services were intended to be gratuitous is one of fact, the plaintiff may rest his case upon an implied promise and can recover, unless it is shown either that there was no intention to charge or that the credit was extended to a third person. Offering his aid does not establish the fact that he intended his services to be gratuitous. In this case the intention to charge the deceased or his estate is sufficiently established by the fact that a day or two after he rendered the service he made a claim and sent a bill for it to the estate.

Woodward on Quasi Contracts, § 201 (1913 Ed.), says:

"It seems to be taken for granted that at the common law there is no legal obligation, independent of contract, to pay for nonprofessional services rendered, in an emergency, in the preservation of life. The intervention may be dutiful; the conduct of the intervener may be heroic. But * * * there is an irrebuttable presumption, based either upon considerations of policy or upon knowledge of normal human conduct, that the service is intended to be gratuitous. The considerations which underlie the irrebuttable presumption just referred to have no application in the case of professional services, as of a physician or nurse. For while such services are usually prompted in greater or less measure by motives of humanity, they are generally rendered with the expectation of compensation. Moreover, in the case of a physician or nurse, there is nothing unworthy in such an expectation. It follows that for professional services, unless there is evidence either that credit was extended to a third party or that there was no intention to charge, the beneficiary should be required to pay reasonable value."

The case of Edson v. Hammond, 142 App. Div. 693, 127 N. Y. Supp. 359, was an action in which the defendant was supposed to be insane and the plaintiff was called by another physician, who had been employed by the defendant's brother, to attend the defendant while he was under restraint in a hospital, and it was held there could be no recovery upon the ground, among others, that the defendant had his own physician, who was not allowed access; and Mr. Justice Dowling, in his opinion, said that the doctrine of the cases of Sceva v. True and Cotnam v. Wisdom would not "seem to justify a recovery for physician's services rendered to one accidently injured, even if rendered unconscious, where immediate attention is not required, and particularly in a city where a free ambulance service exists and where free hospital treatment is furnished by the municipality. The natural course there to pursue is to call upon the gratuitous service thus provided, and the rule founded on the necessity and humanity of other cases does not apply."

If a distinction must be made in the application of the rule as to liability of persons becoming unconscious by an accidental injury or otherwise in a large city, having free ambulance service and free hospital treatment, and elsewhere, where there is no such free service and treatment, then there still remains the question whether, in a large city, such immediate attention was required, and this is a question of fact, involving the consideration of the nature of the disease or of the accident, the time and place where unconsciousness occurs, the time that must elapse before other or free medical treatment can be obtained, and other considerations depending upon the circumstances in each case.

The facts here show that immediate attention was necessary, as

death occurred before the ambulance surgeon arrived, and within a very short time after the plaintiff commenced his treatment, and it was proper and necessary that the doctor should attempt immediately to restore the patient to consciousness and prolong life.

Taking into consideration the easiness of the services, the occasion and circumstances under which they were performed, and all the evidence in the case, I adopt the value placed upon them by the defendants' experts and consider $15 as the reasonable value thereof.

Judgment for plaintiff for $15.