In the Matter of the Claim of Doctor DAVIS and Doctor PARLOW, in the Estate of JOHN C. AGNEW, Deceased.

Surrogate's Court, Monroe County, July 10, 1928.

Executors and administrators — claim against estate — claimants are doctors and have presented claim for performing major surgical operation on decedent as out-patient in hospital — claimants believed decedent to be poor — decedent was, in fact, wealthy — court may take into consideration wealth of decedent in fixing compensation of doctors.

The claimants are doctors of high repute and have presented a claim against the estate of the decedent based on the performance of a major surgical operation on the decedent as an out-patient of the hospital with which the claimants are connected. At the time the operation was performed the claimants did not know that the decedent was a very wealthy man, and assumed that he was a man without any material means.

The claimants are entitled to the reasonable value of their services.

In determining the reasonable value of the services of the claimants, it was proper for the court to consider the financial standing of the decedent and, with that in view, as well as the testimony of the witnesses as to the value of the services rendered, the claimants are awarded $2,000

PROCEEDING for determination of reasonable value of surgical services rendered the testator.

Surrogate's Court, Monroe County, July, 1928.     [Vol. 132

*Harris, Beach & Matson* [*Leonard B. Bacon* of counsel], for the executor.

*Hubbell, Taylor, Goodwin & Moser* [*C. L. Clinton* of counsel], for the claimants.

FEELY, S.   Claimants, who are members of the surgical staff of a local hospital and professors in the medical school connected therewith, having performed a major surgical operation on the decedent as an out-patient in the hospital, without knowledge that he was at the time a very wealthy man, united in presenting a joint claim of $2,000 for their services against his estate.   Under a statement of stipulated facts this court first decided that they were entitled, as a matter of law, to the reasonable value of their services.   (132 Misc. 466.)   Thereupon testimony was taken bearing on the standing and experience of the claimants and the usual charges for such operation.   It was not disputed that each of the claimants is a medical man of high standing, having special experience in the field of urology and in the performance of the operation called prostatectomy.   The witnesses on value gave figures running all the way from $100 to $3,000.   One specialist said he himself followed the rule that if a patient here could not pay $300, the case should go to the dispensary.

In determining the liability of this decedent in availing himself of the out-patient service at the hospital, it was proper to take into consideration his financial ability to pay.   On trial of the issue of reasonable value, it was shown that wealthier patients customarily were asked to pay more than are those in less than middling circumstances.

Just what weight should be given now to this feature of the patient's wealth, in the decision of reasonable value, has been discussed by the courts of this country from their different points of viewing the somewhat similar case of medical services rendered to an unconscious stranger who dies without regaining consciousness. Some States, other than New York, have held that the financial condition of a patient cannot be considered where there is no contract, but where a recovery is sustained on a legal fiction which raises a contract in order to afford a remedy which the justice of the case requires.

" This fiction merely requires a reasonable compensation for the services rendered.   The services are the same, be the patient prince or pauper, and for them the surgeon is entitled to fair compensation for his time, service and skill." (*Cotnam* v. *Wisdom*, 83 Ark. 601.)   Here it was held error to allow proof either that

the patient was wealthy, or that he was a bachelor leaving everything to nephews.

" Certainly no court would hold that the value of ordinary labor could be determined by such a test [as wealth], and upon principle we can see no distinction between such a claim and one of the character now under discussion." (*Swift* v. *Kelly*, [Tex. Civ. App.] 133 S. W. 901.) The latter case concedes that " if the recovery sought in this suit for professional services had been upon an alleged implied contract by plaintiff [defendant in court below] to pay such fees as are customarily charged for the same character of services performed for a patient of like financial ability to pay a fee therefor, then a different question would be presented."

What seems to me to be the basic reason for inclusion of the patient's wealth among the factors of value is a social reason, which was adversely discussed by the Supreme Court of Iowa in 1878 as follows: " It is true a physician in general practice will often be called upon to treat indigent persons from whom he will not be able to recover the value of his services. He may take this into account and regulate his charges with reference to that fact, just as a merchant may take into account probable bad debts in fixing his per centum of profit upon his goods. But the value of a service depends upon the difficulty of rendering it, and the skill required in its performance, and, sometimes, upon the results accomplished, and not upon the riches or the poverty of the person for whom the service is performed. If the ability to pay determines the reasonableness of a charge, then the richer a man is the more he should pay for any service. No such rule of charge can be recognized or countenanced by the law." (*Robinson* v. *Campbell*, 47 Iowa, 625.)

In refusing to disturb an alleged excessive verdict for a surgeon who performed, by request, on defendant's son an unusual, delicate operation, requiring great skill, the General Term, First Department, in 1889, made the following broad comment: " There is also evidence tending to establish a custom or rule of guidance as to charges of physicians for services rendered, and which makes the amount dependent upon the means of the patient, his financial ability or condition; but this is a benevolent practice which does not affect the abstract question of value, or impose any legal obligation to adopt it, and cannot be said to be universal on the evidence. Indeed, there does not seem to exist any standard by which, in the application of the rule, the amount to be paid can be ascertained. Each case is under the special disposition of the surgeon or physician attending, and he is to decide as to the reduction to be made on account of the circumstances of his patient, and therefore, when

the amount is in dispute, it follows that it is to be determined by proofs to be given on either side." (*Lange* v. *Kearney*, 4 N. Y. Supp. 14; affd., 127 N. Y. 676.)

The only New York case I have been able to find in point is one decided by the New York Municipal Court in 1914 (*Schoenberg* v. *Rose*, 145 N. Y. Supp. 831), where a wealthy man fell unconscious in court and two physicians, in attendance as witnesses for the adverse party, at once went to his assistance, but about all they could do for him was to cause artificial respiration for about half an hour, until all signs of life disappeared. One of them later sent in a bill for $500. MARKS, J., said: " The deceased left a very large estate, evidence as to the value of which was received over the objection of the defendants' counsel. I am of the opinion that, while the financial condition of a patient does not alone affect the abstract question of the value of a physician's services, it is a proper element entering into the question as to what charge or what reduction in the charge shall be made by him by reason of such financial condition [citing *Lange* v. *Kearney, supra*] * * * and that element should apply to a case where there is and was no contract, but a mere fiction of the law creating one, else, in a case where services are rendered to an unconscious man who never recovers, the charge against his estate might be so great and unreasonable as to be out of all proportion to the value of the estate. This charge a man who recovers could resist and successfully defend by showing his limited means, and, in the case of an unconscious man who does not recover, such value is an aid to the court in fixing the reasonableness of the claim, whether made against a large or a small estate. Therefore the evidence as to the value of the deceased's estate was properly allowed and properly taken into consideration, and that, together with the experience of the physician as such, and the nature and difficulty or easiness of the case, and what is considered by him and by other physicians an ordinary or reasonable charge for the services, are the proper elements upon which a judge or jury may act in fixing the value of the services. Taking into consideration the easiness of the services, the occasion and circumstances under which they were performed, and all the evidence in the case, I adopt the value placed upon them by the defendants' experts and consider $15.00 as the reasonable value thereof."

The care given by a medical man called to treat an unconscious stranger would most likely be such as not to fall below any standard, scientific, professional or humane. It is likely also that if he recognized the patient in such state to be a personal friend, or a person of wealth, he would exert even more care than in the first case. The excess, however, would not be enough to justify the

difference that would likely be found in the charge for services in the one case as compared with that in the other. The reason must be sought elsewhere.

In measuring the value of a lawyer's services, the prominence of his clients can be taken into account. An equal, and probably a greater, social bearing is attributed to medical service. In order that such skill may be highly developed and well paid, and that the greatest number and the group itself served thereby, it is recognized as a social necessity that those who are quite able to pay, especially, for the best, should pay adequately and liberally, in any case, to avoid the social danger incurred either in allowing those less able, or unable to pay, to go about the community in a diseased, untreated condition, or in allowing the skill and equipment of competent medical men to be lessened, or lost to the locality, by inadequate over-all recompense.

Had this decedent truly made known the fact that he was abundantly able to pay for the excellent surgical service he received, he justly would have been required to pay much more than the minimum of $300, or else submit himself to some less-experienced service.

From the social point of view, it is immaterial whether the wealthy recipient of medical service is, or is not, unconscious at the time the physician is called, or is in attendance. For the same reason, such a person obtaining such service in the manner in which this decedent did, is in no different position. Neither of them has any social right to expect such service from such men at the same rate, the inadequate rate, at which it is received by those who have less successfully made use of the opportunity that society affords, or who happen to be forced to avail themselves of the protection of the individual that accrues from the duty of the group to protect itself as a group.

There is good ground, therefore, underlying the testimony of the medical witnesses to the effect that the services rendered this decedent are reasonably worth the sum of $2,000. His executors are hereby directed to pay to the claimants jointly the sum of $2,000, but without interest, as the claim has been hitherto an unliquidated one. As to costs, however, the executors cannot be said to have unreasonably resisted the claim, in the peculiar circumstances of this case, and so no costs are allowed to either party.

Let the decree be made accordingly and entered.