## COTNAM *v.* WISDOM.

### Opinion delivered July 15, 1907.

1. PHYSICIANS AND SURGEONS—SERVICES TO UNCONSCIOUS PERSON—QUASI CONTRACT.—Where surgeons were called in to attend a person injured in an accident, and in the effort to save his life they performed an operation on him while he was unconscious, and he died without regaining consciousness, the law implies a contract on his part to pay a reasonable compensation for their services. (Page 604.)

2. SAME—RIGHT TO COMPENSATION REGARDLESS OF RESULT.—In the absence of express agreement, a surgeon who brings to services rendered by him to a patient due skill and care earns the reasonable and customary price therefor, whether the outcome be beneficial to the patient or the reverse. (Page 606.)

3. SAME—FINANCIAL CONDITION OF PATIENT.—Where a surgeon was called in an emergency by a bystander to operate on an unconscious patient, who never regained consciousness, and seeks to recover from the latter's estate upon an implied contract to pay for his services, it was error to instruct the jury that in determining what was a reasonable charge by the surgeon for his services they could consider the ability to pay of the person operated upon;" the right to recover under such circumstances being limited to fair compensation for the surgeon's time, service and skill. (Page 607.)

4. SAME—FAMILY RELATIONSHIP.—Upon the issue as to the amount of a surgeon's compensation for performing an operation upon defendant's intestate, the fact that intestate was a bachelor and that his estate was left to neices and nephews was irrelevant. (Page 609.)

Appeal from Pulaski Circuit Court; *Robert J. Lea,* Judge; reversed.

F. L. Wisdom and George C. Abel presented a claim against the estate of A. M. Harrison, deceased, of which T. T. Cotnam is administrator, for $2,000 on account of surgical attention to the deceased, who was killed by being thrown from a street car.

The probate court allowed the account in the sum of $400, and the administrator appealed to the circuit court.

The evidence showed that deceased received fatal injuries in a street car wreck; that while he was unconscious some person summoned Dr. Wisdom to attend him; that Dr. Wisdom called in Dr. Abel, an experienced surgeon, to assist him; that they found that the patient was suffering from a fracture of the temporal and parietal bones, and that it was necessary to perform the operation of trephining; that the patient lived only a short time after the operation, and never recovered consciousness.

Dr. Abel testified, over defendant's objection, that the charge of $2,000 was based on the result of inquiry as to the financial condition of deceased's estate. It was further proved, over defendant's objection that deceased was a bachelor, and that his estate, which amounted to about $18,500, including $10,000 of insurance, would go to collateral heirs.

Various physicians testified as to the customary fees of doctors in similar cases, and fixed the amount at various sums ranging from $100 to $2,000. There was also evidence that the

ability of the patient to pay is usually taken into consideration by surgeons in fixing their fee.

At the plaintiffs' request the court charged the jury as follows:

"1.   If you find from the evidence that plaintiffs rendered professional services as physicians and surgeons to the deceased, A. M. Harrison, in a sudden emergency following the deceased's injury in a street car wreck, in an endeavor to save his life, then you are instructed that plaintiffs are entitled to recover from the estate of the said A. M. Harrison such sum as you may find from the evidence is a reasonable compensation for the services rendered.

"2.   The character and importance of the operation, the responsibility resting upon the surgeon performing the operation, his experience and professional training, and the ability to pay of the person operated upon, are elements to be considered by you in determining what is a reasonable charge for the services performed by plaintiffs in the particular case."

In his opening statement to the jury, counsel for claimants stated that "Harrison was worth $8,000, and had insurance, and his estate was left to collateral heirs, that is, to nephiews and nieces." Counsel for defendant objected to such argument, but the court overruled the objection; and the defendant saved his exceptions.

Verdict for $650 was returned in plaintiffs' favor. Defendant has appealed.

*Mehaffy, Williams & Armistead,* for appellant.

1.   Instruction No. 1 ignores and eliminates the usual requirements that before recovery for services performed there shall be a contract, either express or implied, in fact or by implication of law.   2 Mason, 541; *The Iroquois,* 113 Fed.; 108 *Id.* 292; 58 Ark. 407-418; 84 N. C. 674; 75 *Id.* 191; 2 East, 505; 12 Johns. 351.

2.   The court should have instructed the jury to consider the question of benefits.   81 Ala. 287; 86 Ill. App. 159.

3.   It was not competent to prove the value of the estate, and error to instruct the jury to consider the *ability to pay* in determining what was a reasonable fee.   123 Ala. 391; 47 Iowa, 625; *Lange* v. *Kearney,* 4 N. Y. Supp. 14.

*Moore, Smith & Moore,* for appellees.

1. Implied or *quasi*-contracts have long been upheld. 29 Pa. St. 465; 53 N. H. 630; 1 Beach, Mod. Cont. § § 440-3. Page on Cont. § § 833, 867; 64 L. R. A. 829; 59 Ga. 413; Gilpin's Rep. 447; 95 Minn. 201.

2. The court properly refused to require plaintiff's to prove the benefit, if any, derived from the operation. 116 Wisc. 39; 81 Ala. 287; 86 Ill. App. 159.

3. It was proper to charge the jury to consider the ability to pay, and to prove the value of the estate. 123 Ala. 391; 47 Ia. 625; 4 N. Y. Supp. 15; 35 La. Ann. 796; 50 *Id.* 480.

Hill, C. J. The Reporter will state the issues and substance of the testimony, and set out instructions one and two given at instance of appellees, and it will be seen therefrom that instruction one amounted to a peremptory instruction to find for the appellees in some amount.

1. The first question is as to the correctness of this instruction. As indicated therein, the facts are that Mr. Harrison, appellant's intestate, was thrown from a street car, receiving serious injuries which rendered him unconscious, and while in that condition the appellees were notified of the accident and summoned to his assistance by some spectator, and performed a difficult operation in an effort to save his life, but they were unsuccessful, and he died without regaining consciousness. The appellant says: "Harrison was never conscious after his head struck the pavement. He did not and could not, expressly or impliedly, assent to the action of the appellees. He was without knowledge or will power. However merciful or benevolent may have been the intention of the appellees, a new rule of law, of contract by implication of law, will have to be established by this court in order to sustain the recovery." Appellant is right in saying that the recovery must be sustained by a contract by implication of law, but is not right in saying that it is a new rule of law, for such contracts are almost as old as the English system of jurisprudence. They are usually called "implied contracts;" more properly, they should be called *quasi*-contracts or constructive contracts. See 1 Page on Contracts, § 14; also 2 Page on Contracts, § 771.

The following excerpts from *Sceva* v. *True*, 53 N. H. 627, are peculiarly applicable here:

"We regard it as well settled by the cases referred to in the briefs of counsel, many of which have been commented on at length by Mr. Shirley for the defendant, that an insane person, an idiot, or a person utterly bereft of all sense and reason by the sudden stroke of an accident or disease, may be held liable, in assumpsit, for necessaries furnished to him in good faith while in that unfortunate and helpless condition. And the reasons upon which this rests are too broad, as well as too sensible and humane, to be overborne by any deductions which a refined logic may make from the circumstance that in such cases there can be no contract or promise in fact—no meeting of the minds of the parties. The cases put it on the ground of an implied contract; and by this is not meant, as the defendant's counsel seems to suppose, an actual contract—that is, an actual meeting of the minds of the parties, an actual, mutual understanding, to be inferred from language, acts and circumstances by the jury—but a contract and promise, said to be implied by the law, where, in point of fact, there was no contract, no mutual understanding, and so no promise. The defendant's counsel says it is usurpation for the court to hold, as a matter of law, that there is a contract and a promise when all the evidence in the case shows that there was not a contract, nor the semblance of one. It is doubtless a legal fiction, invented and used for the sake of the remedy. If it was originally usurpation, certainly it has now become very inveterate, and firmly fixed in the body of the law.

　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

"Illustrations might be multiplied, but enough has been said to show that, when a contract or promise implied by law is spoken of, a very different thing is meant from a contract in fact, whether express or tacit. The evidence of an actual contract is generally to be found, either in some writing made by the parties, or in verbal communications which passed between them, or in their acts and conduct considered in the light of the circumstances of each particular case. A contract implied by law, on the contrary, rests upon no evidence. It has no actual existence; it is simply a mythical creation of the law. The laws says that it shall be taken that there was a promise when, in

point of fact, there was none. Of course, this is not good logic, for the obvious and sufficient reason that it is not true. It is a legal fiction, resting wholly for its support on a plain legal obligation **and a plain legal right.** If it were true, it would not be a fiction. There is a class of legal rights, with their correlative legal duties, analogous to the *obligationes quasi ex contractu* of the civil law, which seem to lie in the region between contracts on the one hand and torts on the other, and to call for the application of a remedy not strictly furnished either by actions *ex contractu* or actions *ex delicto.* The common law supplies no action of *duty,* as it does of assumpsit and trespass; and hence the somewhat awkward contrivance of this fiction to apply the remedy of assumpsit where there is no true contract, and no promise to support it."

This subject is fully discussed in Beach on the Modern Law of Contracts, 639 *et seq.,* and 2 Page on Contracts, § 771 *et seq.* One phase in the law of implied contracts was considered in the case of *Lewis* v. *Lewis,* 75 Ark. 191.

In its practical application, it sustains recovery for physicians and nurses who render services for infants, insane persons and drunkards. 2 Page on Contracts, § § 867, 897, and 906. And services rendered by physicians to persons unconscious or helpless by reason of injury or sickness are in the same situation as those rendered to persons incapable of contracting, such as the classes above described. *Raoul* v. *Newman,* 59 Ga. 408; *Meyer* v. *K. of P.,* 64 L. R. A. 839.

The court was therefore right in giving the instruction in question.

2. The defendant sought to require the plaintiff to prove, in addition to the value of the services, the benefit, if any, derived by the deceased from the operation, and alleges error in the court refusing to so instruct the jury. The court was right in refusing to place this burden upon the physicians. The same question was considered in *Ladd* v. *Witte,* 116 Wis. 35, where the court said: "That is not at all the test. So that a surgical operation be conceived and performed with due skill and care, the price to be paid therefor does not depend upon the result. The event so generally lies with the forces of nature that all intelligent men know and understand that the surgeon is not

responsible therefor.   In absence of express agreement, the surgeon, who brings to such a service due skill and care earns the reasonable and customary price therefor, whether the outcome be beneficial to the patient or the reverse."

3. The court permitted to go to the jury the fact that Mr. Harrison was a bachelor, and that his estate would go to his collateral relatives, and also permitted proof to be made of the value of the estate, which amounted to about $18,500, including $10.000 from accident and life insurance policies.

There is a conflict in the authorities as to whether it is proper to prove the value of the estate of a person for whom medical services were rendered, or the financial condition of the person receiving such services.   In *Robinson* v. *Campbell,* 47 Ia. 625, it was said: "There is no more reason why this charge should be enhanced on account of the ability of the defendants to pay than that the merchant should charge them more for a yard of cloth, or the druggist for filling a prescription, or a laborer for a day's work."   On the other hand, see *Haley's Succession,* 50 La. Ann. 840; and *Lange* v. *Kearney,* 4 N. Y. Supp., 14, which was affirmed by the Court of Appeals, 127 N. Y. 676, holding that the financial condition of the patient may be considered.

Whatever may be the true principle governing this matter in contracts, the court is of the opinion that the financial condition of a patient cannot be considered where there is no contract and recovery is sustained on a legal fiction which raises a contract in order to afford a remedy which the justice of the case requires.

In *Morrissett* v. *Wood,* 123 Ala. 384, the court said: "The trial court erred in admitting testimony as to the value of the patient's estate, against the objection of the defendant. The inquiry was as to the value of the professional services rendered by the plaintiff to the defendant's testator, and, as the case was presented below, the amount or value of the latter's estate could shed no legitimate light upon this issue nor aid in its elucidation. The cure or amelioration of disease is as important to a poor man as it is to a rich one, and, *prima facie* at least, the services rendered the one are of the same value as the same services rendered to the other. If there was a recognized usage obtain-

ing in the premises here involved to graduate professional charges with reference to the financial condition of the person for whom such services are rendered, which had been so long established and so universally acted upon as to have ripened into a custom of such character that it might be considered that these services were rendered and accepted in contemplation of it, there is no hint of it in the evidence."

There was evidence in this case proving that it was customary for physicians to graduate their charges by the ability of the patient to pay, and hence, in regard to that element, this case differs from the Alabama case. But the value of the Alabama decision is the reason given which may admit such evidence, viz., because the custom would render the financial condition of the patient a factor to be contemplated by both parties when the services were rendered and accepted.

The same thought, differently expressed, is found in *Lange v. Kearney*, 4 N. Y. Supp. 14.

This could not apply to a physician called in an emergency by some bystander to attend a stricken man whom he never saw or heard of before; and certainly the unconscious patient could not, in fact or in law, be held to have contemplated what charges the physician might properly bring against him. In order to admit such testimony, it must be assumed that the surgeon and patient each had in contemplation that the means of the patient would be one factor in determining the amount of the charge for the services rendered. While the law may admit such evidence as throwing light upon the contract and indicating what was really in contemplation when it was made, yet a different question is presented when there is no contract to be ascertained or construed, but a mere fiction of law creating a contract where none existed in order that there might be a remedy for a right. This fiction merely requires a reasonable compensation for the services rendered. The services are the same, be the patient prince or pauper, and for them the surgeon is entitled to fair compensation for his time, service and skill. It was, therefore, error to admit this evidence and to instruct the jury in the 2nd instruction that in determining what was a reasonable charge they could consider the "ability to pay of the person operated upon."

It was improper to let it go to the jury that Mr. Harrison was a bachelor, and that his estate was left to nieces and nephews. This was relevant to no issue in the case, and its effect might well have been prejudicial. While this verdict is no higher than some of the evidence would justify, yet it is much higher than some of the other evidence would justify, and hence it is impossible to say that this was a harmless error.

Judgment is reversed and cause remanded.

Justices BATTLE and WOOD concur in sustaining the recovery and in holding that it was error to permit the jury to consider the fact that his estate would go to collateral heirs, but they do not concur in holding that it was error to admit evidence of the value of the estate and instructing that it might be considered in fixing the charge.