### NORTON v. ROURKE et al.

1. An employer who merely summons a physician and requests him to care for an employee, who has suddenly become ill while engaged in his duties and has been thereby rendered incapable of acting for himself, is not, in the absence of an express stipulation between the employer and the employee that the former shall furnish medical aid to the latter, liable for the services of the physician rendered under such circumstances.

2. Applying to the evidence in this case the rule above announced, the plaintiff was not entitled to recover.

Submitted January 10.—Decided May 13, 1908.

Complaint. Before Judge Cann. Chatham superior court. July 2, 1907.

W. E. Norton brought an action against John Rourke & Son, a partnership composed of John Rourke and James A. Rourke, and against James A. Rourke individually, to recover $150 for medical and surgical services, claimed to have been rendered by the plaintiff for John Rafferty, an employee of the defendants. The petition alleged, that the services were rendered "at the special instance and request of said defendants, as a firm, and of the said James A. Rourke, individually, for which services the said defendants, and the said James A. Rourke individually, then and there undertook and became liable to pay. The said services so rendered were necessary, and the charges therefor are reasonable." On the trial the plaintiff testified: "I am a physician and surgeon. I am licensed to practice under the laws of Georgia. . . I had occasion to visit the foundry place of John Rourke & Sons. . . Mr. Jim Rourke telephoned me . . to go down and see a man. He asked if that was Dr. Norton. I said, 'Yes.' He said, 'This is Jim Rourke of John Rourke & Sons; come down, I have another man hurt.' I said, 'All right, I will come down right away.' I say it was Mr. Jim Rourke who telephoned to me, because he had telephoned to me about a week before; I recognized his voice immediately. . . I went down to the wharf and met Mr. Rourke, and he said to me, Captain Rafferty is injured on this boat, and I will show you where he is.' I went with him and found Captain Rafferty was in his bunk and unconscious; I ordered the ambulance . . and had him sent home; afterwards I had him removed to the hospital and treated him for his injuries. . . Mr. Jim Rourke told me to do the best I could for the injured man, and I told him that I would. It was his boat, I presume, the man was injured on—he took me down there. . . I never was Mr. Rourke's regular physician. I have done work for the firm. . . I had rendered professional services before at the instance of Mr. Jim Rourke. My services had been engaged by Mr. Rourke before over the telephone. Mr. Jim Rourke did the telephoning then. At that time I went down to Mr. Rourke's machine shops. . . Mr. Rourke asked me where I was going to send Mr. Rafferty. I said I was going to send him home for the present and watch his condition." The witness further testified as to the nature of Raf-

ferty's injuries, the medical and surgical services rendered, and the reasonableness of the charge made therefor. John Rafferty, a witness for the plaintiff, testified: "I was employed on the tugboat Maude. . . I was master and pilot of the boat. I was working for John Rourke & Son. Mr. James Rourke employed me. . . I sustained an injury. . . I had my skull fractured. I fell and had my skull broke. I don't know what caused me to fall. When I fell I was about eight miles from here, on the boat. I was sick and asked a man to relieve me at the wheel, and before he came I fell. . . After I fell I remember nothing. . . When I came to I was at the hospital. I was unconscious about a week, I guess. I didn't employ a physician to attend me. When I came to, Dr. Norton was attending me. . . Dr. Norton used to come to my house on some occasions for my stepson—he never was there for me. . . I had never employed Dr. Norton for myself. I went myself to the marine doctor when anything happened to me. I would be treated free by the Marine Hospital service. . . I didn't pay Dr. Norton anything. He has never presented a bill to me. . . I didn't employ him or authorize his employment. To have free treatment from the Marine Hospital service, I would have had to go to the Marine Hospital. They would not treat me free if I were home." James G. Rafferty testified for the plaintiff: "Captain Rafferty is my father. . . My father was towing mud on the mud scow [at the time he was injured] . . . I got a message to go down to John Rourke & Sons' place, which I did. I met, when I got down there, Mr. Jim Rourke. He asked me who was the family physician, and I said Dr. Norton; he said, 'You better telephone for him.' I said, 'All right,' and I started to do it, and he said to me, 'No, never mind, I will telephone for him myself.' He went off and I went aboard the boat. I found my father lying in the lower bunk. He was seriously hurt. Dr. Norton came there. We put my father in an ambulance and I went home with him in the ambulance. . . If I had gone to the telephone when I started, I would have had to walk a couple of hundred feet, I guess. I am a cripple; I walk with a crutch. . . He (my father) had worked for him [Mr. Rourke] two or three or four months. My father didn't work for him after he got well."

James A. Rourke testified for the defendants: "I am a member of two firms. The machine and foundry business has three mem-

bers in the firm; the firm name is Rourke & Sons; the members of
the firm are my father, my brother John, and myself. The firm of
John Rourke & Son is composed of my father and myself. This
firm owns the tugboat Maude and all floating property—lighters,
tugboats, and so forth. This is the firm that owned the tugboat
Maude at the time of the injury to Captain Rafferty. I got down
there on the morning this accident happened, shortly after seven.
Some time after I got down there I saw the engineer of the boat,
and then it was I heard of the accident to Captain Rafferty. I
sent a boy after his son. I went to see the old man; he was lying
in the bunk. . . When I saw him the boat was lying at the
wharf. . . When he [James Rafferty] came down, I told him
the old man was hurt and asked him what he wanted done; . .
he said, 'Better get the family physician.' I asked who it was;
'Dr. Norton,' he said. . . . Young James Rafferty is incorrect
in his statement that I told him to go and telephone for a doctor
and finally said no, that I would do it for him. I didn't offer to
do that telephoning. I didn't do the telephoning at all. I didn't
go to the telephone. . . Harry Singleton, a white man, who was
engineer of the boat, was standing there at the time of this conversa-
tion; he went to have the doctor telephoned for. . . Dr. Norton
is not my family physician. He does not do the work for Rourke &
Son. . . Dr. Owens is my father's physician. I knew that Cap-
tain Rafferty was a licensed captain. All steamboat people get their
treatment free. All we had to do would be to send him to the Ma-
rine Hospital; . . you have to sign a printed slip to get a steam-
boat man in there, that is all. . . I had previously employed Dr.
Norton to render services down there. That employment was over
the telephone. I expect I did the telephoning at that time. . . I
don't think I said [to Dr. Norton] . . 'Do the very best you can
for this man.' I would not be positive about it." Thomas J. Bey-
taugh, a witness for the defendants, testified, that he was book-
keeper for John Rourke & Son at the time Captain Rafferty was
injured, and that he telephoned from the office of John Rourke &
Son to Dr. Norton to come down there. He did not remember who
requested him to telephone, but he had not seen James A. Rourke
that morning before telephoning. The testimony of Henry Single-
ton, a witness for the defendants, was to the effect, that he was the
engineer of the steam tug Maude when John Rafferty met with the

accident, and brought the boat to the wharf with him, and imme-
diately sent for his son, James Rafferty, who, immediately upon
his arrival, requested the witness to send for Dr. W. E. Norton,
who was the family physician; and that the witness went to the
office of John Rourke & Son and requested the bookkeeper to tele-
phone to Dr. Norton to attend Captain Rafferty. James Rafferty
denied that he requested Singleton to send for Dr. Norton.

A nonsuit was granted as to the partnership, as the bill of ex-
ceptions states, "after all testimony had been introduced by both
plaintiff and defendants." A verdict was rendered in favor of de-
fendant James A. Rourke. The plaintiff moved for a new trial,
the motion was overruled, and he excepted, complaining of the
nonsuit and the refusal of a new trial.

*Twiggs, Oliver, Gazan & Oliver,* for plaintiff, cited 103 Cal. 79;
92 Ala. 258; 95 Am. Dec. 484; 50 Ill. 26; 18 Kan. 458; 57 Am.
St. R. 172; 4 L. R. A. (N. S.) 58; 1 Am. & Eng. Enc. L. (2d ed.)
984; 22 Id. 139 (c); 57 *Ga.* 92.

*Osborne & Lawrence,* for defendants, cited 29 *Ga.* 399; 59 *Ga.*
409; 48 L. R. A. 396.

FISH, C. J. (After stating the facts.) When one summons a
physician to care for another, rendered by sudden illness unable to
act for himself, and to whom he stands in no relationship which
creates an obligation to furnish necessary medical care, and no ex-
press undertaking is entered into, then, from the mere summoning
of the physician and requesting him to care for the person who is
ill, the law does not presume an implied promise by the one so
acting to pay for the services of the physician summoned. Meisen-
bach *v.* Southern Cooperage Co., 45 Mo. App. 232; Jesserich *v.*
Walruff, 51 Mo. App. 270; Smith *v.* Watson, 14 Vt. 332; Starrett
*v.* Miley, 79 Ill. App. 658. In the last case cited, a woman who
was, so far as appears from the report of the facts, a stranger to
Starrett, ran into his house, wounded and bleeding, and fell there
unconscious. He at once called in Miley, a physician, and directed
him to the injured woman and told him to care for her. Starrett
also had her carried to a room in his house. No express promise
was made by him to pay the physician for the services rendered the
woman. It was held that Starrett was not liable for the physician's
services. In Boyd *v.* Sappington, 4 Watts (Pa.), 247, it was held
that a request by a father to a physician to attend his son, then

of full age, and sick at the father's house, raised no implied prom-
ise on the part of the father to pay for the services rendered. In
Crane v. Baudouine, 55 N. Y. 256, the plaintiff attended as a.
physician upon the daughter of defendant, sick at the latter's house.
The daughter was of age, married and living with her husband,.
but temporarily at her father's house, to be under the care of her
mother. Defendant was present at the calls, gave plaintiff a his-
tory of the case, and received directions for her treatment. He·
told others of the visits and of his opinion of the case, assented
to calling a consulting physician, and had previously employed
other physicians to attend his daughter. Defendant testified that
he did not employ or send for plaintiff. It was held that the de--
fendant was not liable for the plaintiff's services. In Holmes v.
McKim, 109 Iowa, 245, it was held: "One is not under any im-
plied obligation to pay for the services of a physician called to at--
tend a minor living with his family and supported by him, but:
not otherwise related to him, though he acquiesced in the attend--
ance and had on a former occasion paid the same doctor for attend--
ing the same minor, the physician knowing, however, the true rela--
tions of defendant and said child." The doctrine is well stated
in 22 American & English Encyclopædia of Law, 790. In Meisen--
bach v. Southern Cooperage Co., supra, Judge Seymour D. Thomp--
son, delivering the opinion, said: "The reason and policy of this
rule are obvious. . . When a person is dangerously wounded
and perhaps unable to speak for himself, or suffering so much that·
he does not know how to do it, . . any person will run to the
nearest surgeon in performance of an ordinary office of humanity.
If it were the law that the person so going for the surgeon thereby
undertakes to become personally responsible for the surgeon's bill,.
and especially for the surgeon's bill through the long subsequent
course of treatment, many would hesitate to perform this office,
and in the meantime the sufferer might die for want of necessary
immediate attention. Nor is there a common and fair understand--
ing that the person making the request, or ordering it to be made,
in behalf of the sufferer, under the circumstances assumes respon-
sibility for the surgeon's bill."

The general rule is well settled that a master is not, in the ab--
sence of some stipulation, under any legal obligation to furnish
medical attendance for a servant who falls sick while engaged in,

his duties. 26 Cyc. 1049; 20 Am. & Eng. Enc. L. 52; and see the valuable monographic note to the case of The Kenilworth, in 4 Lawyers' Reports Annotated (N. S.), 52, wherein many cases in point are collated. In *Sweetwater Manufacturing Co.* v. *Glover* 29 *Ga.* 399, decided in the days of slavery, it was said: "When one white man employs another to work for him, it is not an implication or incident that the employer shall pay the employee's physician's bills; it would require an express contract to create that obligation." There are cases holding that there are exceptions to this general rule, but it is needless to cite them, as it is not contended that the case at bar falls within any of the exceptions. In view of the authorities noted, the evidence in the present case, considered in its most favorable light for the plaintiff in error, did not authorize a recovery against either the defendant firm or the individual member thereof against whom the action was brought. While it would have been better practice to have directed a verdict at the conclusion of the evidence submitted by the parties, rather than to have granted a nonsuit as to the defendant firm, this is a matter of which plaintiff in error can not complain. As the verdict was demanded by the evidence, it is not necessary to pass upon the exceptions to the charge.

*Judgment affirmed. All the Justices concur.*