## 15076. CALLAWAY *v.* BARMORE.

1. The evidence authorized the inference that the person who executed the alleged contract on behalf of the defendant had authority to execute it.

2. The court committed error, under the peculiar facts and circumstances of this case, in charging the jury that if a certain instruction was in fact given by the defendant to the alleged agent, the relation of principal and agent, as a matter of law, arose between them when the latter proceeded thereunder.

3. "Where one holds another out as his special agent, the principal is bound by the agent's apparent authority to do the particular thing thus authorized, as well as to do any and all things usual and necessary, and to employ all usual and necessary means that may be reasonably required, in the due, proper, and ordinary performance of the particular purpose of the appointment." The charges complained of in grounds 6 and 7 of the motion for a new trial were in accordance with this principle, and not erroneous.

4. The court did not err in charging the jury that if they found that the plaintiff was entitled to recover any of the damages sued for, they might add interest thereto from the date of the breach of the contract, if they deemed it proper to do so, embracing the whole in one amount.

5. The evidence authorized the verdict, and the judgment overruling the motion for a new trial is reversed solely because of the error pointed out in the second headnote and the corresponding division of the opinion.

DECIDED SEPTEMBER 19, 1924.

Complaint; from city court of Atlanta—Judge Reid.    September 15, 1923.

*Westmoreland & Smith, Frank A. Hooper & Son,* for plaintiff in error.

*Hardwick & Jordan,* contra.

JENKINS, P. J.  E. R. Barmore, a contractor and builder, brought suit in the city court of Atlanta against E. C. Callaway for the breach of an alleged contract whereby, it is averred, he was employed by the defendant, "acting through one H. K. Chapman, architect, to do certain construction work; namely, to underpin and support the east wall of what is known as the Clark property, situated at 23 E. Alabama street, Atlanta, Ga., for the purpose of safely holding said wall until the defective stone wall should be removed and replaced.  The portion of the said wall to be underpinned and supported was a section of twenty-five feet, or such amount as to safely guard the division wall during said removals and replacements at this point.  The price agreed upon for said work was $500."  The petition alleges that soon after the plaintiff entered upon the work the defendant stopped him and prevented his performance of the alleged contract, causing him the damage sued for.  A verdict was found for the plaintiff, the defendant made a motion for a new trial, which the court refused, and he excepted.

1.  It is vigorously maintained by the plaintiff in error that the verdict is without evidence to support it, because of the absence of any proof of authority in the architect Chapman to make the contract.  The owners of the property in question were a Miss Clark and her sister, who lived in California.  They were aunts of the defendant's wife.  He resided in Atlanta and, as a relative of the owners, was concerned in the protection of their interests, and while he would advise them, he was in no sense their agent.  These facts are undisputed.

Chapman, the architect, sworn as a witness for the plaintiff, testified with reference to three separate conferences which he had with the defendant, Callaway, preceding his action in employing the plaintiff in the defendant's name to do the work upon the wall.  He said that at the first conference Callaway called his attention to the defective wall and asked him to go down and look at it, declaring to him at the time, however, that, while he, Calla-

way, was interested in the owners, he was not their agent, had no authority to act as such, and that any contract would have to be made by B. D. Watkins & Company, the owners' representatives. The second conference was after the witness had examined the wall and found it, as he said, in a dangerous condition. He testified that he reported this fact to Mr. Callaway and advised that it was "hazardous to leave that wall to stand in that shape," but that Mr. Callaway requested him to go down and look at it again, in order to verify his opinion; and that at that time he called the plaintiff, Barmore, to meet him there. With reference to the third conference, the witness testified: "I then [after the second visit to the wall] went back and reported to Mr. Callaway that I was still of the same opinion, that the wall should be made safe as soon as possible, and Mr. Callaway told me at that time to have the wall jacked up and made safe, and then they would see how much would have to be replaced and what other work would have to be done on it." Thereafter, without further communication with Callaway, Chapman proceeded to make the contract in his behalf upon which the plaintiff relies.

Other evidence of this witness was as follows: "He stated that his wife was a niece of Miss Clark, and he was interested in Miss Clark, but that Watkins Company were her agents here, to collect rents and look after the building, and for me to go and look at it and make an estimate, but Watkins would have to make the contract with me; but he told me not to see the Watkins people until I saw him and let him know what it was going to be." "After I had reported to him exactly the condition of it he said, 'Have it jacked up and made safe, held in place, and then we will see what can be done with it.'" Q. "He didn't tell you to go out and make a contract with anybody else did he?" A. "Well, no contract had been made at that time." "No, sir, he didn't tell me, 'Mr. Chapman, you get a contractor, go there and fix that wall, and make a contract with him.'" Q. "He never did authorize you to make that?" A. "He never authorized me to have that wall jacked up." "He told me to have that wall jacked up and made safe. He didn't tell me to make a contract, or have a contract for it, because he left that in my hands. No, sir, he didn't authorize me to make a contract with any contractor to jack up that wall." The jury might have concluded from this testimony

that while the defendant did not in terms authorize the witness to enter into a contract, he nevertheless instructed the witness to have the wall jacked up and made safe.

The defendant testified that he never instructed Mr. Chapman to make any contract about having the work done, and denied most positively that he directed him to have the wall jacked up and made safe. He claimed that Chapman solicited work and told him about the defective wall, and that he replied: "Mr. Chapman, I haven't any authority to make any contract for the work. The agents are Watkins & Company, who have entire charge of Miss Clark's property, and they have asked me to look at the wall, and to advise with Miss Clark, so that I could advise Watkins & Company." He testified that he promised merely to recommend Chapman for the job, and that he said to him: "You will have to make your ultimate contract with them [Watkins & Company], as I have no right or title in it, and have no right to make the contract;" that he tried "to make it plain," and further said to Chapman: "If you will go down and look at the wall, you might see what you think it would cost, so that we can tell Miss Clark;" that thereupon Chapman went to examine the wall and reported its condition; that Chapman then asked if he should now go down and see Watkins & Company, to which the defendant replied: "No, you will lose time now, and might lose the job. I will tell you in ample time when to get in touch with them;" and that the most he ever said to Chapman was: "I am going to advise that that wall be jacked up if I never go any further with it. It is time for you to get busy."

The defendant claims not to have had any further conversation with Chapman until the next day, when he found that Chapman had undertaken to contract with Barmore on his behalf. It appears that the contract was instantly repudiated, and that Barmore was required by the defendant to desist from its further execution.

The action is not founded upon the theory that the defendant undertook without authority to contract on behalf of the owners of the property. But the plaintiff is seeking to hold him to a contract which he is alleged to have made upon his own credit through his alleged agent Chapman. We think the evidence for the plaintiff was sufficient to authorize the inference that while Callaway at first did not intend to enter into any contractual rela-

tions either upon his own account or in behalf of the owners, desiring merely to become informed as to the condition of the property of his wife's relatives, in whom he was interested, in order that he might advise them or their agents of any needed repairs, he nevertheless, finally, on being informed that the wall was in danger of collapsing at any time and was requiring immediate attention, concluded, in view of the emergency, to pledge his own responsibility to the extent of such temporary measures as would make the wall safe, after which such general and permanent repairs as the condition of the wall might require should be provided through Watkins & Company, whom he had mentioned at the outset as the only ones authorized to act for them. The evidence for the plaintiff warranted the conclusion that on account of his relationship to the owners and his solicitude for their best interests, he decided ultimately to employ his own credit toward guarding against the more serious losses which might result to them if the wall did not have immediate attention, taking the risk of reimbursement, or waiving it. If he told Chapman to have the wall jacked up and made safe, his declaration at the same time that he was unauthorized to act for the owners might perhaps, under one view of it, even tend to strengthen the inference that he was acting for himself.

The conflict in the testimony as to whether he gave Chapman such directions was one of fact which, of course, has been settled in favor of the plaintiff by the jury, and by their solution of it, whatever may have been the actual truth, this court under the law is absolutely bound. The evidence was sufficient to *authorize* a finding that Chapman was empowered as the defendant's agent to make the contract.

2. In one of the special grounds of the amended motion error is assigned upon the following charge of the court: "The plaintiff contends that the defendant gave directions to Mr. Chapman to have this wall referred to jacked up and made safe. If you believe that contention to be true, that would constitute Mr. Chapman the agent of Mr. Callaway, in so far as the subject-matter referred to was concerned." It is insisted that even though the jury should have believed that the defendant directed Chapman to have the wall jacked up and made safe, it was still for them to determine whether under all the facts and circumstances such direction would

constitute Chapman the agent of Callaway, with authority to make the contract in question; that is, to make a contract with *another* to do the work; that the charge erroneously authorized the jury to find from the evidence that Chapman was the agent of the defendant, although he was informed that the defendant would not make any contract in connection with the work on the wall, and that it contained an expression of opinion by the court as to what facts would constitute Chapman the agent of the defendant, when such question was one of fact to be determined by the jury.

We have seen that under the evidence given by the architect for the plaintiff the jury were authorized to find that the defendant told the architect to "have the wall jacked up and made safe." But the question for our decision on the exception to the above-quoted excerpt from the charge of the court is not whether such statement was actually made, but, assuming, as we must, that it was made, the inquiry is whether or not, under all the facts and circumstances of the case, the defendant must necessarily be taken to have been then and there acting for himself, or whether he may have been continuing to assume to act for his absent relatives while disclaiming any legal and binding authority so to do. The jury has never passed upon this phase of the case. The court decided this question in plaintiff's favor as a matter of law. In other words, the effect of the instruction to the jury was that, no matter how plainly it might appear that the defendant had been assuming to act for his relatives and not for himself, while candidly stating that he was without legal authority to bind them, the mere giving of the direction indicated authorized the architect to conclusively assume or presume as a matter of law that he thereby intended to impliedly revoke and withdraw all of his previous plain and positive inhibitions upon his personal liability; and that he must thereby have necessarily intended to impliedly assume to bind his own individual credit. In view of the fact that in all the previous conversations the defendant had made it unmistakably clear that he was assuming to act, though without legal authority, for the owners and not for himself, it is our opinion that the jury should have been allowed to say whether the direction quoted should have impliedly authorized the architect to assume a "right about face" in all that the defendant had so plainly and so repeatedly emphasized relative to his own status and personal

responsibility. The record shows that the premises belonged to non-resident relatives of the defendant's wife; that, while the defendant disclaimed any sort of right or interest therein, he was nevertheless assuming to protect their interest; and that in doing so he candidly disclaimed any legal authority and plainly denied individual responsibility. It appears from the record that the architect, under whose employment the plaintiff acted, had sought out the defendant for the purpose of obtaining employment for himself; that the defendant, on being thus solicited, called the architect's attention to the building in question; and that the architect then reported to the defendant a need of emergency repairs. The architect swore: "Yes, he told me he would try to get the job for me, I had been doing work for him; he told me B. D. Watkins Company was agent for Miss Clark, that I would have to make my contract with them, that he was not the agent." The evidence for the defendant was to the effect that the most he ever indicated was that he would consult with his relatives, "advise" having the work done, and try to "throw the job" to the soliciting architect. He swore that he in fact took it up with them by telegram. The architect's own evidence, however, is such as to thus plainly indicate that the defendant had clearly let him understand that he was acting in the interest of and advising with his relatives. It thus indisputably appears that the architect, in soliciting work from the defendant, knew that, while he was dealing with one without any sort of personal interest or legal authority in the subject-matter of the negotiations, he nevertheless dealt with him as one who was related to the owners, and who, as their relative, was assuming to protect their best interest in the emergency which the architect reported to be in existence. The architect could, if he chose, have thus relied upon the influence of the defendant with the owners in having them to approve and ratify his acts and conduct in having the emergency work done and in "throwing the job" to him. We believe, therefore, that, even accepting the evidence of the architect exactly as given, to wit, that Callaway finally told him to "have the house jacked up and made safe," it was still a question for the jury whether he should be assumed to have thereby reversed everything he had hitherto plainly said respecting his own status, and to have thereby intended to impliedly pledge his own personal and individual credit; or whether, in view

of the entire absence of any express assumption of personal liability, and in view of the previous conversations and all the surrounding facts and circumstances, this relative of the absent owners, though without personal interest or legal authority, was continuing to assume to protect their immediate interest and incidentally to "throw the job" to this particular architect.

The case of *Raoul* v. *Newman, 59 Ga.* 408, cited for the plaintiff in error, seems to be directly in point. In that case, as here, there could never have been any sort of possible question as to the defendant's lack of authority (unless by an implied agency to procure necessaries for the injured child in the absence of the father) to bind any person for the services except himself, but in that case it was held that "the jury ought to consider all the circumstances, and determine whether the plaintiff believed, and had a right to believe, that the defendant was offering his own credit," when he, as the plaintiff did in this case, directed that the work be done. The instant case seems stronger for the defendant, for while here just as in that case no express pledge of the defendant's credit is claimed, but only an implied assumption of personal responsibility is contended for, yet in this case it *indisputably* appears that the defendant, though without personal interest or legal authority in the matter, had throughout the transaction made it known that he was assuming to act for and was *advising* with the owners. · It might possibly seem to the jury that, after having repeatedly made his status as a mere interested relative of the owners and friend of the architect absolutely clear, the architect should have received from the defendant something more definite than the one alleged implied, but vague and indefinite, assumption of personal liability. Of course, the defendant *might* have pledged his own credit for the benefit of his relatives and of his friend, but, in view of all the facts and surrounding circumstances, such an intention need not be necessarily assumed, even had the jury been permitted to pass upon that issue. Section 3613 of the Civil Code (1910) provides, that "all agents, by an express undertaking to that effect, may render themselves individually liable, and every agent exceeding the scope of his authority is individually liable to the person with whom he deals." Here it is not sought to hold the defendant liable on account of any *express* personal undertaking, nor on account of having ex-

ceeded his legal authority, since it is conceded that he, as the friend and relative of the owners for whom he was assuming to act, disclaimed any such. It by no means necessarily follows that one cannot assume to act for and on behalf of another because of the fact that he expressly disclaims legal authority to bind him. Where a person does not actually pledge his own credit, and all the facts and surrounding circumstances are such as plainly to indicate that he has been assuming to act solely in the interest and for the benefit of another, the fact that he candidly disclaims all legal authority to bind the person in whose interest he may assume to act does not necessitate the conclusion that he must have acted for himself. As already stated, it was just as patent in the *Raoul* case as it is here that the defendant was without any sort of legal authority to bind any one for the services except himself, but since in that case, as here, he did not expressly bind himself, the court held that it was a question for the jury to determine, in view of all the surrounding facts and circumstances, whether or not he should have been taken to have actually intended to do so.

Mr. Mechem, in his valuable text-book on Agency, has this to say (§ 1370): "Where agent disclaims present authority. If the doctrine of the previous section be sound, as it unquestionably is, then *a fortiori* will the agent not be liable where he expressly disclaims any present authority, and leaves the other party to take the chances. He may, of course, expressly undertake to procure authority or ratification, but such an undertaking would not be lightly inferred." It might be contended that the authority just cited begs the question, for it purports to deal with a case where the *agent* disclaims authority. In reply, it might be asked, when is an agent not an agent? When he disclaims any power as such. The above-quoted authority recognizes that despite such disclaimer he may nevertheless assume to act as agent, and that one dealing with such a person must depend at his peril upon the ratification of his conduct. Such might have been the opinion of the jury as to what the situation was in the instant case. An architect soliciting business for his own personal benefit and profit is told about a certain building belonging to absent relatives of the defendant, which might need attention. The defendant expresses his interest in the welfare of the architect and in the owners as

43

his relatives, but disclaims any interest in the property and any authority to bind the owners. The architect reports back that an emergency exists; and the defendant, who has been assuming to act for the owners, though disclaiming the legal authority of an agent, upon the emergency being reported tells the architect to "have the wall jacked up and made safe," without any hint of express assumption of personal liability. Must the court hold as a matter of law that such an intention should be *necessarily* implied? How easy indeed it would have been for the architect, who throughout was acting in his own interest, to have inquired of the defendant, who had repeatedly disclaimed personal responsibility, if he thereby meant impliedly to take back all that he had previously emphasized and thus inferentially assume personal and individual liability. This was not done. It is merely assumed. In the absence of any express undertaking on the defendant's part, and in view of all the surrounding facts and circumstances, the jury should have been permitted to say whether the defendant was continuing to act, as he had hitherto assumed to act, for his absent relatives in the reported emergency, or whether he thereby intended to reverse his attitude and bind his individual credit for their benefit and for the benefit of his friends.

We are the more convinced of the correctness of this position for another reason. The architect, according to his own and the plaintiff's theory of the case, was but a special agent authorized to do a particular thing on the implied responsibility of the defendant. "In special agencies for a particular purpose, persons dealing with the agent should examine his authority." Civil Code (1910), § 3595. "Persons dealing with an agent for a particular purpose are bound to inquire as to the extent of his authority." *Harris Loan Co.* v. *Elliott &c. Co.*, 110 *Ga.* 302 (2) (34 S. E. 1003). Bearing in mind this elementary principle of law, we find that the architect testified as follows: "Acting under those instructions, if I can put it that way, I received from Mr. Barmore an estimate in this shape, $500 minimum, that is all we could see at that time would have to be done there at least, of $500, and in case the entire wall would have to be removed, the maximum price would be $2,000. *This was a little higher, more expensive than I thought it would be, and I knew Mr. Callaway didn't think that the cost would be that high* (italics ours), so that I would not close with

Mr. Barmore at that time, telling him I would see Mr. Callaway, discuss the matter with him, and then let him know. I went back over to the coffin company the third time, but it was late in the afternoon then, and Mr. Callaway had gone, and I tried to locate him down at the town office in the Candler Building, and he was not there, hadn't been there, so I didn't get in touch with Mr. Callaway. I told Mr. Barmore I believed the claim—I believe Mr. Barmore called me up after I got home myself, and I told him I had not been able to get with Mr. Callaway to report this proposal, and for Mr. Barmore to hang up and let me call Mr. Callaway at his apartment, which I did, and could not get that phone to answer. I suppose Mr. Callaway was not there, and then in a few minutes Mr. Barmore called me up, and I stated to him that I had been unable to get Mr. Callaway, but he had given me instructions to have that wall made safe, and for him to go to work, *and I would draw up a contract in the morning, the next morning* (italics ours), to be signed by Mr. Barmore, and would have it ready for him, and to come around to sign that contract. Mr. Barmore hauled a good deal of blocks and tackle and stuff. I went over there and saw the pile when I was trying to stop the work the next day. *I think I finally got in contact with Mr. Barmore the next day about twelve o'clock and stopped the work.* [Italics ours.] As soon as Mr. Callaway and Mr. Johnson ordered me to have the work stopped, I notified Mr. Barmore's men to stop and to tell Mr. Barmore not to proceed any further until we got together with Mr. Callaway on this proposition."

It thus appears that, not only was the plaintiff chargeable with the duty of seeing that the architect, as the alleged agent of Callaway, did not exceed his authority, but it appears that he was actually put on express notice that the architect agent was assuming to enter upon a contract which he himself thought was "a little higher and more expensive" than it should have been, and was certainly higher and more expensive than his alleged principal contemplated. In other words, the plaintiff is not only seeking to hold the defendant personally liable on an implied assumption of personal liability, despite all the surrounding facts and circumstances looking to the contrary, but would hold him on a contract the cost of which the architect himself thinks was to some extent excessive. The evidence authorized the inference that both

the architect and the plaintiff knew' the price was more than, under the plaintiff's theory of the case, the defendant ever contemplated or intended he should be bound for. Can the agent bind his principal for a contract if both he and the plaintiff knew it was not contemplated or intended by his principal? The jury might have found that the plaintiff went forward with his eyes open, actually knowing that the architect agent was trying to bind the defendant to a contract which both knew exceeded anything which the alleged principal had contemplated or intended. The architect had an interest in letting the contract, but as agent for the defendant he could not let his interest and his duty to his principal conflict. The explanation given by the architect for thus exceeding what the jury might have found was the extent of his authority was that the defendant was absent from his office late in the evening, presumably after office hours, and that he failed to get an answer to a telephone call at the defendant's residence.

We do not go so far as to hold that the evidence demanded a finding either that Chapman exceeded his authority in regard to the price, if given the direction claimed, or that the plaintiff knew he was exceeding his authority if he did so. We have considered the evidence upon these questions merely as shedding light upon the question of whether the court erred in charging the jury that if Callaway told Chapman to have the wall jacked up and made safe, such direction, as a matter of law, would necessarily authorize Chapman to proceed as Callaway's agent. We think the charge was error.

3. In ground 6 of the amended motion for a new trial error is assigned upon the following charge of the court: "But, if Mr. Barmore knew that there was a limitation upon the authority of Chapman as to fixing the price, he would be bound by such knowledge; and if he knew that there was a limitation upon the authority of Chapman in relation to fixing the price, if he knew before Chapman could fix the price that he must refer the question back to Mr. Callaway, then he would not have had the right to assume that Chapman had a right to fix the price, and Callaway would not be bound by any contract made by Chapman in excess of his actual authority, if Barmore knew what the actual authority was. To restate that again: if Callaway in fact gave Chapman authority to have the wall jacked up and made safe,

that would carry with it-the authority to fix the price, and Barmore had a right to assume that he had authority to fix the price. But if in truth Barmore knew that there was a limitation and that Chapman had no authority to fix the price, then Barmore could not act on the assumption that he did have the authority, but himself would be bound as well as Chapman by the limitation upon his authority, if there was such; so that if Mr. Chapman had to refer the question of price back to .Callaway, and Barmore knew this, then he could not assume that Chapman had authority to fix the price, and the contract, if made, would not be binding on Callaway, if there was such limitation." It is assigned that, the evidence being insufficient to authorize the finding that Chapman was more than a special agent, any limitation upon his authority would be binding on the plaintiff, even if he did not have knowledge thereof, and that the judge therefore illegally placed upon the defendant the burden of showing such knowledge before he could have advantage of his contention that even if Chapman was his agent, he was merely authorized to obtain estimates of the cost of the work and submit them to the defendant for approval before proceeding to contract.

The evidence did not establish that Chapman was more than a special agent (see *First National Bank* v. *Nelson*, 38 *Ga.* 391 (1), 401 (95 Am. D. 400) ; *Foster* v. *Jones*, 78 *Ga.* 150, 1 S. E. 275) ; and while it is provided in the Civil Code, § 3595, that "in special agencies for a particular purpose,. persons dealing with the agent should examine his authority" (see also *Baldwin Fertilizer Co.* v. *Thompson*, 106 *Ga.* 480, 32 S. E. 591; *Harris Loan Co.* v. *Elliott &c. Co.*, supra; *Thomas* v. *Bagley*, 119 *Ga.* 778, 47 S. E. 177), it is also declared in the same code section that "the agency will be construed to include all necessary and usual means for effectually executing it," and this latter provision is applicable as well to special agents as to general agents.  See *Bass Dry Goods Co.* v. *Granite City Mfg. Co.*, 119 *Ga.* 124 (45 S. E. 980).  And so long as a special agent does not go beyond the necessary and usual means for executing his agency, his powers with reference to the *particular undertaking* are in the nature of those of a general agent to the extent that private instructions or limitations not known to the person dealing with him cannot affect them.  "A principal is bound to the extent of the apparent authority he has

conferred upon the agent, and not by the actual or express authority, where that differs from the apparent authority." *Turner* v. *Clark,* 143 *Ga.* 44 (3), 46 (84 S: E. 116). See also *Raleigh & Gaston R. Co.* v. *Pullman Co.,* 122 *Ga.* 700 (4) (50 S. E. 1008). "Where one holds another out as his special agent, the principal is bound by the agent's apparent authority to do the particular thing thus authorized, and to employ all usual and necessary means that may be reasonably required, in the due, proper and ordinary performance of the particular purpose of the appointment. Civil Code (1910), § 3595." *Wise* v. *Mohawk Rubber Co.,* 23 *Ga. App.* 255 (98 S. E. 100). The instructions here considered were not erroneous for any reason assigned. What has been said will dispose of ground 7 of the motion for a new trial, wherein similar questions are raised by exceptions to a further extract from the court's charge.

. While we have already stated our conclusions with reference to certain phases of the evidence, we will repeat, in this connection, that we do not think the evidence *demanded* a finding, although authorizing it, that Chapman exceeded his authority as to the amount he might agree to pay for the work, if he had the instructions claimed, although it is shown in his testimony that he thought that Barmore's price was higher than Mr. Callaway would like. He hesitated to agree to Barmore's figures, and, after receiving them, tried to get in touch again with Callaway before closing the contract, but, on failing promptly to do so, directed Barmore to go ahead. This evidence, while showing a preference on the part of Chapman to obtain Callaway's final approval, did not, as a matter of law, demand the conclusion that he was bound to do so.

But even if it were otherwise, the verdict found for the plaintiff would not be illegal upon that ground, unless the evidence also showed *conclusively* (as it did not) that Barmore was put upon notice as to the special limitation upon Chapman's authority having sole reference to the price.

4. Error is assigned upon the following charge of the court: "Under the law, then, you would have the right, if you think it is right to do so, to add a sum equivalent to interest at the rate of seven per cent. per annum from the date of the breach of the contract until this date. Under the law you would not be required

to add this sum equivalent to interest, but you have a right to do so if you think it is right. Your method of ascertaining this sum would be to calculate interest on the amount you think the plaintiff ought to recover from the date of the breach of the contract to this date." It is contended that "said charge was error for the reason that, under the facts in this case, the plaintiff would not be entitled to interest upon the amount of his recovery, because the plaintiff's damages, if any, were unliquidated, and the amount uncertain. Movant contends that said charge was error for the further reason that the interest would not be computable from the date of the breach of the contract, as stated by the court, but would only run from the date when, under the contract, plaintiff would have received the contract price for the work in question." While in actions for unliquidated damages interest is not recoverable eo nomine, it is not error in such a case for the court to instruct the jury that if they should find that the plaintiff is entitled to damages, they may, if they see proper, add interest thereto and embrace the whole in one amount. This is true even in tort cases. *Central Railroad* v. *Sears,* 66 *Ga.* 499; *Western & Atlantic R. Co.* v. *McCauley,* 68 *Ga.* 818; *Gress Lumber Co.* v. *Coody,* 104 *Ga.* 611 (30 S. E. 810). "In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest *from that time* till the recovery" (italics ours). Civil Code (1910), § 4396. Whether such interest will be allowed or not is discretionary with the jury. This was recognized and observed in the charge.

5. The evidence authorized the verdict. The judgment of the trial court, overruling the motion for a new trial, is reversed solely for the error pointed out in headnote 2 and the corresponding division of the opinion.

*Judgment reversed. Stephens, J., concurs. Bell, J., dissents.*

BELL, J., dissenting. I cannot agree to the ruling of the majority as contained in the 2d headnote and the corresponding division of the opinion, nor, therefore, to the judgment of reversal. The question is, if Callaway in fact directed Chapman to have the wall "jacked up and made safe," did such direction, as a matter of law, establish the relation of principal and agent between them, when the latter proceeded thereunder, as the court in effect instructed the jury? In support of the negative of this question,

the plaintiff in error cites the case of *Raoul* v. *Newman*, 59 *Ga.*
408. Raoul was the station agent of the Central Railroad at
Macon. A negro boy 13 or 14 years of age was severely injured
in the yards of the company's warehouse. The father of the
child was absent. Raoul called in Newman, a physician, and
said to him: "Go ahead, do what you can for the boy." New-.
man rendered the services as requested and charged the same to
Raoul. He subsequently sued Raoul and recovered. The Supreme
Court, upon exceptions by the defendant, said: "It seems, more-
over, to have been thought by the court that any employment of
the plaintiff by the defendant, however it may have been intended
and understood at the time, would render the defendant personally
liable. This is not correct. The jury ought to consider all the
circumstances, and determine whether the plaintiff believed, and
had a right to believe, that the defendant was offering his own
credit. If, in the presence of a great and overwhelming calamity
to a human being, the defendant was merely acting for the absent
father, and the plaintiff so understood it, the father would be
liable for any necessary services rendered by the physician, and
the defendant would not be liable for anything done by the
physician after he became enlightened as to the true situation.
For coming to the spot when sent for by the defendant he would
be entitled to a fair and reasonable compensation, if he came upon
a bare message, without being advised of the circumstances under
which it was sent."

In commenting upon this case in *Green* v. *Coast Line R. Co.*,
97 *Ga.* 15, 36 (24 S. E. 814, 33 L. R. A. 806, 54 Am. St. R. 379),
the Supreme Court said: "This court held that if there was a
great and overwhelming calamity to the child, rendering medical
aid instantly necessary, the parent would be responsible as for
necessaries, and Raoul would be treated as his agent to call the
physician." If the injured party had been an adult, and Raoul
had called the physician just as he did, it would seem that *in no
view* could he have been held liable for the physician's services.
See *Norton* v. *Rourke*, 130 *Ga.* 600 (61 S. E. 478, 18 L. R. A.
(N. S.) 173, 124 Am. St. R. 187). In such a case, in the absence
of an express contract, the physician should infer only that the call
was one of humanity and not of a party offering to contract. As
to who would be liable under such circumstances, see Cotman *v.*

Wisdom, 83 Ark. 601 (104 S. W. 164, 12 L. R. A. (N. S.) 1090, 119 Am. St. R. 157, 13 Ann. Cas. 25).

In the case at bar, if Callaway said to Chapman, "Have that wall jacked up and made safe," his statement could not have been taken as a call of humanity, as in the *Norton* case; nor were there circumstances from which the law could imply an agency to act for another, as was true in the *Raoul* case; and yet Callaway was at all times stating that he had no authority as agent to bind the owners. In each of the cases just referred to there was some one else besides the speaker who could be held liable,—in the *Raoul* case the boy's father, in the *Norton* case the injured party himself, he being an adult. Cotman *v.* Wisdom, supra.

If the evidence in the case now under consideration had authorized the inference that Callaway was the agent of Miss Clark and her sister, then the language ascribed to him could not have been held, as a matter of law (whether as a matter of fact), to have evidenced an intention to contract on behalf of himself rather than as the agent of the owners. But since every one concerned agrees that he was not the owners' agent and did not presume to act as such, no other reasonable inference is possible to be drawn from such declaration by him, under the circumstances, if he made it, than that he intended to bind himself, and that for such purpose he nominated Chapman as his agent. Any other interpretation of the direction by Callaway to Chapman, if given as claimed, would, under the undisputed circumstances, have placed Callaway in the anomalous attitude of one who, though declining to pledge his own credit in behalf of relatives of whose interests he was solicitous but for whom he was expressedly not authorized to make contracts, would yet call upon another, apparently a stranger to them, to assume responsibility for the expense of the urgently needed work upon their property, *without any assurance that anybody would ever pay for it.* Was the interested relative and adviser requesting that the stranger take the risk? There is nothing to indicate that Mr. Callaway would have taken a position so unreasonable and abnormal; and unnatural characteristics should not be attributed to him without evidence. While it is true that "where reasonable men might differ as to the inferences to be drawn from certain evidence, the matter should be left to the jury" (*Dixon* v. *Bristol Savings Bank,* 102 *Ga.* 461 (2), 468

(31 S. E. 96, 66 Am. St. R. 193) ; *Toole* v. *Edmondson,* 104 *Ga.* 776, 784, 31 S. E. 25), yet, if the testimony of Chapman was true, that Callaway told him to have the work done, it could lead to no other reasonable conclusion, under all the circumstances, than that Callaway intended to become personally responsible.

When a given state of facts will bear several different interpretations it is the function of the jury to say which one of them should be adopted, but where only one reasonable inference can be drawn therefrom, the question resolves itself into one of law, and may be determined by the court. Civil Code (1910), §§ 5735, 5926, 5943 ; *Toole* v. *Edmondson,* supra.

Again, Chapman was an architect. Callaway knew it. The language ascribed to the latter, if uttered, did not, under the circumstances, reasonably import that Callaway intended that he should be responsible only in the event that Chapman should do the work himself, but implied nothing less than that he should have it done by others. If this testimony is true, he was told to *have* the work done. "The relation of principal and agent arises wherever one person expressly or by implication authorizes another to act for him." Civil Code (1910), § 3569. Even if Chapman should have undertaken the work himself, necessarily he would have had to employ help. The details of accomplishing the desired end were not given. The execution would have involved a discretion. "Agency may also be defined as the relation created by express or implied contract or by law, whereby one party delegates the transaction of some lawful business with more or less discretionary powers to another, who undertakes to manage the affair and render to him an account thereof. 1 Am. & Eng. Enc. Law 937." *Burkhalter* v. *Ford Motor Co.,* 29 *Ga. App.* 592 (116 S. E. 332). "The agent's authority will be construed to include all necessary and usual means for effectually executing it." Civil Code (1910), § 3595.

The excerpt from the charge left it to the jury to solve the conflict between the testimony of Chapman and that of Callaway as to whether the latter directed the former to have the wall jacked up and made safe. In my opinion, the trial judge was right when he then told the jury that if they found that issue in favor of the plaintiff, "that would constitute Mr. Chapman the agent of Mr. Callaway, in so far as the subject-matter referred to was

concerned." I think that the extract from Mechem on Agency quoted by my esteemed associates is wholly irrelevant. It has reference only to a situation where one assumes to act *as agent for another* without authority, and his want of authority is disclosed. In such a case, it is manifest that the fact that the principal cannot be bound would not be cause for charging the agent. Compare *Peeples* v. *Perry,* 18 *Ga. App.* 369 (39 S. E. 461). In the instant case there was no effort to hold the defendant liable as one having assumed *to act as agent for another* when he had no authority, but the case is predicated upon the theory that the defendant, recognizing and expressly declaring his want of authority to bind the owners, proposed to act in the premises upon his own account.

I think that the trial was free from error, and that the motion for a new trial was properly overruled.