[No. 22676.   Department One.   December 15, 1930.]

E. O. HOUDA, *Respondent,* v. HAZEL K. McDONALD, *as Executrix, Appellant.*[1]

*Robert B. Abel* and *C. T. Haas,* for appellant.
*Wm. H. Pratt* and *R. M. Davis,* for respondent.

PARKER, J.—The plaintiff, Dr. Houda, seeks recovery from the defendant, Mrs. McDonald, as executrix of the estate of her deceased husband, O. B. McDonald, for medical and surgical services rendered by him to her over a period of several months during the fall of 1928, and up until April, 1929. Mr. McDonald died in July, 1929. Soon thereafter Mrs. McDonald became the duly appointed and qualified executrix under his will. Thus there devolved upon her the administration of both his estate and the estate of their marital community.

Thereupon Dr. Houda presented to Mrs. McDonald, as executrix, his claim for compensation for his services in the sum of $15,000. She refused to approve

[1]Reported in 294 Pac. 249.

this claim for that amount, but approved it as an indebtedness of the estate in the sum of $1,000. Dr. Houda refused to accept that sum in settlement of his claim, and commenced this action seeking recovery of the whole amount claimed by him. The cause proceeded to trial in the superior court for Pierce county, sitting with a jury, and resulted in verdict and judgment awarding to Dr. Houda recovery in the sum of $3,500, from which Mrs. McDonald, as executrix, has appealed to this court.

The question here to be decided is, Does the evidence sustain recovery in the sum of $3,500, as awarded by the verdict and judgment? More particularly, did the trial court erroneously admit certain evidence which, if excluded, would result, as a matter of law, in a failure of proof to sustain any award to Dr. Houda in excess of $1,000? There were appropriate timely motions made in behalf of Mrs. McDonald challenging the sufficiency of the admissible evidence to sustain any recovery by Dr. Houda in excess of $1,000. There was no motion for a new trial made in her behalf.

Viewing the controlling facts as favorable to Mrs. McDonald as the record warrants, we think they may be fairly summarized as follows: For a period of several years prior to the fall of 1928, Mrs. McDonald had been seriously afflicted with goiter. She had undergone much treatment, and had undergone one surgical operation looking to its cure. Dr. Houda has for many years made a special study of goiter and its treatment, and has become a specialist in such treatment. In the fall of 1928, Mrs. McDonald learned of his special qualifications in that regard, and called upon him for advice and treatment, and then commenced to receive treatments by him. The technical nature of Dr. Houda's treatments so rendered to Mrs. McDonald need not be here described. With

reference to them, it is enough to say that, during the following several months up to April, 1929, his treatments substantially reduced the goiter, but because of its age it could not be effectively permanently dissipated except by a surgical operation, and to that end she concluded to and did undergo such an operation by Dr. Houda, she manifestly being well advised as to its seriousness.

Dr. Houda testified that "the operation, so far as the result is concerned, could not be nicer." This is not denied. Indeed, there was no testimony, other than that of Dr. Houda, showing the nature, extent and effect of his treatment of and operation upon Mrs. McDonald. It is conceded that a goiter operation, such as Dr. Houda performed upon Mrs. McDonald, is a major operation. Indeed, it was so testified by all of the physicians and surgeons who testified in the case. Mrs. McDonald did not testify upon the trial.

We now notice facts, proof of which was received over the objections of counsel for Mrs. McDonald. At the time Dr. Houda treated and operated upon Mrs. McDonald, she and her husband were possessed of community property of the approximate value of $1,600,000, which was for the most part income producing property, though the evidence does not indicate with any degree of exactness the amount of the annual income therefrom. Neither appears to have had any separate property. In making his charge of $15,000 for his services rendered to Mrs. McDonald, Dr. Houda, considering himself correctly advised as to the wealth of Mr. and Mrs. McDonald, took that into consideration, together with the seriousness of Mrs. McDonald's affliction, the importance of his services to her and the skill required of him in performing that service. He did not have any express agreement or understanding with either Mr. or Mrs. McDonald as to the amount

he was to receive for his services. He made and claimed his charge as a reasonable compensation for his services. A physician and surgeon of some twenty-four years' experience in practice in Tacoma testified for Dr. Houda in part as follows:

"Q. Are you familiar with the general practice of physicians and surgeons in this community and in this state with reference to the matter of fixing the amount of their bills, considering the financial standing of the patient? A. I am. Q. What is that practice? A. I think it would be according to the financial standing of the patient, his annual income, a certain amount. A poor person would not pay as much, or anything at all. Q. What is the relation between the bill for a major operation and the yearly income? A. I would say about ten per cent of the annual income."

Then in response to a hypothetical question as to the reasonable amount of Dr. Houda's compensation, describing his treatment of Mrs. McDonald and stating the approximate wealth of Mr. and Mrs. McDonald, the witness answered: "A. I should think his fee of $15,000 would be just."

Another experienced physician and surgeon of some thirty years' practice, eighteen of which have been in Tacoma, testified for Mrs. McDonald, touching the reasonable amount of compensation for Dr. Houda for rendering his services to Mrs. McDonald, as follows:

"Q. Are you familiar with the practice of physicians and surgeons in this community as to taking into consideration the financial standing of their patients in fixing the fee? A. I am familiar with it. . . . It is based upon their income, the amount they earn per month or year. Q. Roughly speaking, what is the relationship between the amount of the estate or the amount of the income and the fee for major operations? A. The practice varies somewhat. With some it is a practice of charging a month's income for major operations; again, ten per cent of the total yearly income for major operations. Q. State how

widespread that practice is? A. So far as I know it is universal in the United States. Q. And you are familiar with the general practice throughout the country in that respect? A. I am, fairly so.''

And then, following a hypothetical question of substantially the same nature as that above noticed, this witness answered: ''A. I would say a $15,000 fee is reasonable and proper.''

Another experienced physician and surgeon of some forty years' practice in Tacoma testified for Dr. Houda substantially as the two above noticed. Evidence of the wealth of Mr. and Mrs. McDonald, and the testimony of the three physicians being admitted, all over the objection of counsel for Mrs. McDonald, another experienced physician and surgeon of some twenty years' practice in Tacoma testified for Mrs. McDonald as follows:

''Q. Would the fact that a man is of substantial financial standing make any difference in the fee for goiter operation upon his wife? A. Yes, it does. Q. Having in mind the ability of a patient to pay for surgical operation, what would you consider a reasonable fee for the ordinary goiter operation and the ordinary treatment that precedes and follows a goiter operation, for a man reputed to be a millionaire? A. I would consider five hundred dollars to one thousand dollars would be a large fee.''

Another experienced physician and surgeon of some ten years' practice in Tacoma and many years' experience elsewhere testified for Mrs. McDonald as follows:

''Q. Are you familiar with the medical fees charged in this city? A. Yes, sir. Q. And for ordinary goiter operations here? A. Yes. Q. What is the ordinary charge? A. The ordinary charge, from one hundred fifty dollars up. Q. Does the financial ability of the person to pay make any difference in the reasonable value of the service? A. Yes, sir. Q. Do you know of this ten per cent basis which has been testified to?

A. Yes, I use that. Q. To what extent do you apply it? A. I try to apply it to most major operations that I do, up to a certain limit.''

And then, being asked a hypothetical question substantially as above noticed as to what he would consider a reasonable compensation for Dr. Houda's services to Mrs. McDonald, he answered: "A. I would personally consider one thousand dollars a good fee.''

██ These five physician witnesses gave all of the expert or opinion testimony as to what would be a reasonable compensation to Dr. Houda for the services rendered by him to Mrs. McDonald. So, we have all of the expert opinion witnesses agreeing that the wealth and income of the patient is customarily considered as an element controlling in some measure the amount of reasonable compensation a physician and surgeon may be entitled to for services of the nature here in question; though in this particular case their respective estimates of the reasonable compensation to Dr. Houda for his services rendered to Mrs. McDonald ranged from $500 to $15,000. Thus, we think, it becomes plain that, if wealth and income of a patient are admissible facts to be proven in a controversy of this nature, then the evidence of the wealth of Mr. and Mrs. McDonald and the testimony of the physicians were admissible to be considered by the jury in this case, and manifestly support the verdict and judgment awarding to Dr. Houda recovery in the sum of $3,500.

There seems to be some lack of harmony in the decisions of the courts touching the admissibility of proof of pecuniary circumstances of the person liable for the rendering of medical and surgical services, as compensation for such services. We notice, in chronological order, the decisions which have been brought to our attention: In *Robinson v. Campbell*, 47 Iowa 625, decided in 1878, the question there presented was

stated and disposed of by the court in its opinion as follows:

"The plaintiff introduced evidence tending to show the pecuniary condition of defendants, and that the ability of the patient to pay sometimes forms an element in the amount of the charge. Respecting this the court charged as follows: 'The facts of the circumstances of the parties subject to be charged as defendants herein do not constitute an element in fixing the value of the services. And, if any evidence has been offered on this subject, the jury should entirely disregard it as the right to recover an amount that might be recovered on the financial worth or standing of the defendant.'

"The plaintiff assigns the giving of this instruction as error. The instruction is, we think, correct. There is no more reason why this charge should be enhanced on account of the ability of the defendants to pay, than that the merchant should charge them more for a yard of cloth, or the druggist for filling a prescription, or a laborer for a day's work. It is true a physician in general practice will often be called upon to treat indigent persons from whom he will not be able to recover the value of his services. He may take this into account and regulate his charges with reference to that fact, just as a merchant may take into account probable bad debts in fixing his *per centum* of profit upon his goods. But the value of a service depends upon the difficulty of rendering it, and the skill required in its performance, and, sometimes, upon the results accomplished, and not upon the riches or the poverty of the person for whom the service is performed."

In that case there was evidence of the pecuniary condition of the defendants who had requested the service to be rendered to the patient, their mother; and also evidence which, we assume, showed the service to be a major operation. That was not a case of attempted measurement of the amount of the patient's liability for the service, by considering her pecuniary condition, as is this case.

In *Lange v. Kearney,* 51 Hun 640, 4 N. Y. Supp. 14, decided by the New York supreme court in 1889, that court took the opposite view from that of the Iowa court, observing as follows:

"It must be further observed that, although the sum demanded by the plaintiff seems to be large in contemplation of the defendant's income, nevertheless it appears that he is the owner of property, and, although it may embarrass him, or subject him to inconvenience, he can pay it—he has the ability to do so. It may be justly said that the plaintiff saved the life of the defendant's son, and by a master performance, which united skill, knowledge, and experience, and without which it could not have been done. The exceptions are valueless. The plaintiff had a right to show that his standing in the profession was high. The measure of compensation must be controllèd more or less by ability in all the professions, and the service rendered by its responsibilities and success. We see no reason for disturbing the judgment."

That decision was affirmed by the court of appeals in 127 N. Y. 676, 28 N. E. 255.

In *Morrissett v. Wood,* 123 Ala. 384, 26 South. 307, decided in 1898, there was involved the reasonableness of a physician's compensation chargeable to the estate of his deceased patient, the question being stated and disposed of by the court in its opinion as follows:

"The trial court erred in admitting testimony as to the value of the patient's estate, against the objection of the defendant. The inquiry was as to the value of the professional services rendered by the plaintiff to the defendant's testator and, as the case was presented below, the amount or value of the latter's estate could shed no legitimate light upon this issue nor aid in its elucidation: The cure or amelioration of disease is as important to a poor man as it is to a rich one, and, *prima facie* at least, the services rendered the one are of the same value as the same services rendered to the other. If there was a recognized usage obtaining in the premises here involved to graduate professional

charges with reference to the financial condition of the person for whom such services are rendered, which had been so long established and so universally acted upon as to have ripened into a custom of such character that it might be considered that these services were rendered and accepted in contemplation of it, there is no hint of it in the evidence.''

That case differs from this case in that there was no recognized usage or custom shown of physicians and surgeons charging, in some measure, according to the financial worth of their patients. In *Morrell v. Lawrence,* 203 Mo. 363, 101 S. W. 571, decided in 1907, there was involved the reasonableness of the compensation for medical services rendered to a forty-two year old son at the request of his father, the father apparently not being legally burdened with the support of the son. The principal controversy there seems to have been as to whether or not the father was at all liable. However, one of the questions there presented was stated and disposed of by the court in its opinion as follows:

''It was shown in evidence over the objection of the defendant that he was a very wealthy man, and on the measure of damages the court in its instructions authorized the jury to take that fact into account. . . . In a case of this kind, if the plaintiff is entitled to recover at all, he is entitled to recover the reasonable value of the services rendered. He is entitled to a verdict for the reasonable value of his services, although the defendant may be a poor man; he is not entitled to a verdict for more than the reasonable value of his services, although the defendant may be a man of great wealth. The jury, in a case of this kind, have no concern with the question of the defendant's ability to satisfy the judgment.''

Here again we have a case, not of a physician claiming compensation from his patient, but one of compensation claimed from another apparently under no legal

obligation for the support of his patient. Nor does there appear in that case to have been any evidence of custom or usage on the part of physicians to measure their charges partially by the wealth or income of their patients. In *Cotnam v. Wisdom,* 83 Ark. 601, 104 S. W. 164, 119 Am. St. 157, 12 L. R. A. (N. S.) 1090, decided in 1907, there was involved the reasonableness of a physician's charge for services rendered to a stranger who had accidentally become unconscious by reason of an accident, and died without recovering consciousness. It was there held that the value of the emergency service rendered by the physician was not properly measurable to any extent by the wealth of the deceased, the court reaching this conclusion seemingly upon the theory that there was no contract, either express or implied, with the deceased for the services rendered, and that therefore his wealth could not be taken into consideration in fixing the reasonable charge for the services of such physician, though the physician was held to be entitled to a reasonable charge for his services, not considering the wealth of the deceased. In *Swift v. Kelly,* 63 Tex. Civ. App. 270, 133 S. W. 901, decided in 1910, the service in question was rendered by the plaintiff physician to the defendant himself. The report of the case does not show the service was of such serious nature as a major operation. Evidence of the wealth of the defendant was held inadmissible, citing *Robinson v. Campbell,* 47 Iowa 625. In *Young Bros. v. Succession of Von Schoeler,* 151 La. 73, 91 South. 551, decided in 1922, there was involved a question of the reasonable compensation of a physician for services rendered to his deceased patient; claim being made against the estate of the patient. In disposing of the question substantially as here presented, the court, in its opinion, said:

"Law and jurisprudence have not laid down any hard and fast rule for guidance in the matter of physicians' charges. Courts must of necessity, to a very great extent, rely on the opinions of reputable members of the profession as to the value and character of the services rendered. And such charges are not to be determined wholly upon the skill of the physician, nor upon the amount of services rendered, but the value of the patient's estate and his ability to pay may be taken into consideration. *Czarnowski v. Zeyer,* 35 La. Ann. 796; *Succession of Haley,* 50 La. Ann. 840, 24 South. 285.

"In *Succession of Levitan,* 143 La. 1027, 79 South. 829, 3 A. L. R. 1646, the court said that it was common information that physicians and surgeons do not regulate their charges by any fixed standard of pecuniary value, but, to a certain extent, base them on the ability of the patient to pay. The property of the succession of Mrs. Von Schoeler is inventoried at about $40,000. It is worth much more than that sum. In view of all of the testimony, we are not prepared to say that the charges made by the plaintiffs are unreasonable or excessive."

In the late case of *Pfeiffer v. Dyer,* 295 Pa. St. 306, 145 Atl. 284, decided in 1929, there was presented the question of reasonable compensation for services rendered by a physician, the claim being made against his patient. The question was disposed of in harmony with the views of the Louisiana court, citing the decisions of that court above noticed.

We are of the opinion that the rule best supported by reason, in any event as applicable to this case, is, that in some substantial measure the reasonable compensation of the physician is determinable by the ability of the patient or her husband to pay for the service; since the contract for the service was by the physician directly with the patient, for the service to be rendered to the patient, the services including a major operation, and it being shown by competent evidence

that it was customary among physicians to charge for such service in some measure according to the ability of the patient to pay for such service.

The judgment is affirmed.

MAIN, TOLMAN, and HOLCOMB, JJ., concur.

MITCHELL, C. J., concurs in the result.